CONAM ALASKA, an Alaska Joint Venture between Conam Construction Company and Champion Constructors, Inc., Appellant and Cross–Appellee.

v.

BELL LAVALIN, INC., an Alaska Corporation, F. Robert Bell and Associates, an Alaska Sole Proprietorship, Lavalin, Inc., a Canadian Corporation, Partec Lavalin, Inc., a Canadian Corporation, Cimarron Holdings, Inc., a Texas Corporation, Appellees and Cross–Appellants.

Nos. S–4022, S–4039.

Supreme Court of Alaska.

Nov. 27, 1992.

Kenneth D. Jensen, Kevin M. Morford, Jensen, Harris & Roth, Anchorage, for appellant and cross-appellee.

Hugh G. Wade and David P. Gorman, Wade & De Young, Anchorage, for appellees and cross-appellants Bell Lavalin, Inc., Partec Lavalin, Inc. and Lavalin, Inc.

David B. Ruskin and Mary Louise Molenda, David B. Ruskin, P.C., Anchorage, for appellee F. Robert Bell & Associates.

Before RABINOWITZ, C.J., and BURKE, MATTHEWS, COMPTON and MOORE, JJ. ·

## OPINION

COMPTON, Justice.

This case arises from a failed subcontractor relationship on a project on the North Slope. Conam Alaska appeals the superior court's dismissal of its professional negligence cause of action and the superior court's formulation of a jury instruction on piercing the corporate veil. Bell Lavalin cross-appeals, seeking to overturn the jury's verdict that Conam Alaska was excused from performing the contract and was entitled to damages.

## I. *Factual and Procedural Background*

### A. THE PARTIES

The various business entities that evolve out of the parent corporations and their interrelationship makes presentation of this case difficult. We therefore start with a brief discussion of the corporate relationships.

Bell Lavalin, Inc. (Bell Lavalin) is an Alaska corporation formed by F. Robert Bell & Associates (FRB) and Lavalin, Inc. (Lavalin) for the purposes of bidding on and performing large construction jobs on the North Slope. FRB and Lavalin each held fifty percent of Bell Lavalin's corporate stock. Bell Lavalin had no employees of its own. F. Robert Bell (Bell), the sole proprietor of FRB was president of the corporation; its other officers and directors were all employees of Lavalin or FRB.

Lavalin is a Canadian corporation operating internationally as a multidisciplinary engineering and construction management firm. It has the financial capability and staff to undertake a large engineering and construction management project. However, Lavalin did not have experience or contacts in Alaska. It therefore joined with FRB, which had experience and contacts in North Slope civil engineering.

Partec Lavalin, Inc. (Partec), is a Canadian corporation, wholly owned by Lavalin. Partec is one of Lavalin's engineering resources.

Conam Alaska (Conam) is an Alaska joint venture between two Alaska corporations, Champion Constructors, Inc. and Conam Construction Company. Conam Construction Co. is a subsidiary of Cimarron Holdings, Inc. Champion Constructors is a subsidiary of Cook Inlet Region, Inc. (CIRI), an Alaska Native Corporation. The joint venture was formed to perform general construction on the North Slope.

### B. THE PROJECT

The dispute which generated this litigation arose out of the construction of four 55,000 barrel oil storage tanks at Kuparuk for ARCO Oil and Gas Company (ARCO). The tanks were to be built on gravel pads with vinyl lined containment dikes around each tank. The tanks would be used by ARCO to hold oil diverted from the pipeline connecting the Kuparuk production wells to the TransAlaska Pipeline.

After ARCO issued a request for proposals (RFP) for the project in October 1984, Bell Lavalin and Conam had numerous discussions about creating some type of relationship and performing the project together. They bid the project as a team[1] and eventually agreed that Bell Lavalin would

---

1. Conam and Bell Lavalin entered into a verbal agreement whereby Conam agreed not to provide its prices to other contractors bidding on the job and Bell Lavalin agreed not to accept quotes from other general contractors.

be the prime contractor, responsible for all design work, and Conam would be the subcontractor, responsible for all construction in the field. Bell Lavalin was awarded the project. It subcontracted the design work to FRB and Partec, and the field construction to Conam. Conam then subcontracted the off-site fabrication and on-site erection, coating and insulation of the tanks to Rockford Corporation (Rockford).

## C. THE CONTRACTS

ARCO's RFP called for a design/build format whereby the contractor was to perform all engineering, design and construction necessary to complete the project. The contract between ARCO and Bell Lavalin was an "end result" contract, rather than a "method and means" contract. This allowed the contractor to select construction techniques to achieve the desired result. The contract contained only the general project specifications, which were included in the RFP, and provided that all project specific plans, specifications and drawings be prepared by Bell Lavalin and approved by ARCO. The contract required substantial completion by November 30, 1985. The timing of the project was critical since ARCO justified the expense on savings it would realize from having the tanks operational during the planned spring 1986 shutdown of the TransAlaska Pipeline. Thus the prime contract required that Bell Lavalin submit a project schedule. A schedule was submitted and was revised three times. The first three versions indicated that design would be completed by June 1, 1985. The fourth schedule had design and engineering completed by September 20, 1985.

The subcontract between Conam and Bell Lavalin incorporated the prime contract in its entirety by reference. Conam would supply all labor and material necessary to complete the construction work within the time required by the ARCO contract.[2] Conam was also responsible for all quality control. The subcontract also required

that Bell Lavalin inform Conam of any communication Bell Lavalin had with ARCO which affected Conam's interests.

The subcontract included a procedure for modifying Conam's obligations under the contract. Conam could submit Contract Change Requests (CCRs), which would indicate a need for change in specifications, the anticipated impact of a change in plans on the schedule and break down the estimated cost of the particular change. Bell Lavalin would review the CCRs and forward them to ARCO for approval. ARCO would issue Contract Change Directives (CCDs), specifying the modified obligation. This procedure was used repeatedly throughout the project.

The subcontract between FRB and Bell Lavalin provided that FRB was responsible for all civil design work. The subcontract between Partec and Bell Lavalin assigned Partec all the remaining design work. In addition, Partec was to serve as Bell Lavalin's agent in providing off-site and on-site project and construction management services.

## D. THE PROBLEMS

The problems began when ARCO moved the tank site, causing delays in earthwork and design. Instead of completing the design and engineering and formulating project specific specifications at the start of the project, Bell Lavalin furnished designs as the project went along. Bell Lavalin had announced its intention to ARCO to rely on the general specifications included in the RFP, but did not communicate this to Conam. Only a small percentage of the plans were completed by June 1. Conam repeatedly requested the missing design and engineering and advised Bell Lavalin that the lack of design information was causing delays.

The project fell behind schedule quickly. Bell Lavalin made repeated requests upon Conam to accelerate work. At ARCO's request, Bell Lavalin relieved Conam of its quality control responsibilities.

**2.** The exception was the fabrication of certain pump and control modules which were to be fabricated off-site and delivered to the job site by Bell Lavalin. Conam remained responsible for installing the modules.

Conam submitted several CCRs as the project went along. ARCO approved more than $1 million in changes through this procedure. Bell Lavalin, however, frequently changed cost and other data before forwarding the forms to ARCO, including deleting all parts of the CCRs which indicated that there would be a schedule impact. Similarly, references to the lack of contract drawings were deleted. Additionally, Bell Lavalin would extend to Conam a portion of the additional expenses granted by ARCO. ·

The project was dealt a serious setback when Rockford walked off the job on July 19, 1985, after ARCO rejected the steel tank sections supplied by Rockford.[3] Following the Rockford walkoff, Conam requested that Bell Lavalin ask ARCO to grant a time extension for completion. Bell Lavalin requested of ARCO that the completion date be moved to the spring and the project shut down for the winter. The specified work could not be performed in the winter because the project called for the installation of a dynaloy liner. Dynaloy is a vinyl product which becomes very brittle in cold and would be impossible to install in the winter.

On July 31, 1985, Bell Lavalin proposed two alternative schedules to ARCO. One schedule assumed that Conam could get Rockford back on the job. The other assumed a new vendor would be found Both provided for a winter shutdown.

On August 1, 1985, Bell Lavalin, ARCO and Conam met to discuss the scheduling proposals. Conam left the meeting with the understanding that an extension was granted.[4] Conam then resubcontracted with Rockford and also with Interstate Coatings for work which assumed a winter shutdown. The new subcontracts were made with Bell Lavalin's approval. Rockford returned to the project on August 4, 1985.

On August 8, ARCO advised Bell Lavalin that it would require a detailed analysis of the impact of the Rockford walkoff and documentation demonstrating how a time extension would be utilized before granting an extension. On that same date, Bell Lavalin indicated to Conam that ARCO had reneged on the promised extension. Around August 15 Bell Lavalin rejected a Conam schedule including the six month extension. On August 26 Conam submitted another revised schedule which showed a December 15 completion date, but included the caveat that some of the work "may be a problem due to weather." This revised schedule was approved by ARCO.

Problems arose again in September. After Rockford completed work on the first tank, the quality control inspector, an FRB employee under Partec supervision, approved the work and released the tank to be sandblasted and coated by Interstate Coatings. Interstate Coatings mobilized its operations to the North Slope. However, shortly after it began the sandblasting, Interstate Coatings was ordered to stop by Bell Lavalin after ARCO inspectors rejected the tanks. Conam was forced to handgrind the tanks and work was delayed for 2-½ weeks. Also, after two tanks had almost been completed, Partec substantially revised the piping requirements. Substantial reworking was required and the sandblasting was further delayed. Ultimately, Interstate Coatings was not able to recommence work until October 8, 1985. By this time, weather conditions made it very difficult to coat the tanks.

On November 15, 1985, Conam indicated to Bell Lavalin by letter that further work on the project was commercially impracticable and proposed a revised schedule, consistent with the schedule presented to ARCO in July, with weather sensitive work being performed in the spring. Conam continued working pending an answer from

3. Evidence introduced at trial established that Rockford's bid to Conam deviated from ARCO's RFP specifications. The main defect was that ARCO wanted the anti-corrosive coating applied to the tank steel after the tanks had been installed and hydrotested. Instead, Rockford applied the first coating off-site.

4. The jury found that an extension had been granted. Bell Lavalin admitted as much in its briefs on cross-appeal.

Bell Lavalin. Bell Lavalin stopped payment on a progress payment check previously delivered to Conam. The check was for over $800,000. Bell Lavalin demanded that Conam continue work without interruption. On November 19, 1985, Conam demobilized its work force. Bell Lavalin completed the project in March 1986 after ARCO eliminated the requirement for the dynaloy liner.

At the time of Conam's walkoff, about 87% of the base contract work had been completed. The contract sum claimed by Conam for the work completed, including agreed upon change orders was $9,738,932. Conam also claimed that it was due an additional $1,668,597 for other change order work, the value of which had not yet been agreed. Conam had been paid $5,486,350. Thus Conam's contract claim was for $4,438,200, 87% of the value of the work actually performed ($11,407,529 × .87, or $9,924,550), less the amount received ($5,486,350). ARCO settled with both parties paying Conam $1 million and Bell Lavalin $1.2 million.

## E. THE TRIAL

Conam filed suit. It alleged one count of breach of contract, one count of abandonment of contract, and one count of breach of duty of good faith and fair dealing against Bell Lavalin; one count of fraud, and one count of negligent design and engineering against Bell Lavalin, FRB and Partec. Because Bell Lavalin had few assets, Conam also sought to pierce the corporate veil or have Bell Lavalin declared a joint venture to reach the assets of FRB and Lavalin.

Bell Lavalin counterclaimed against Conam and its parent corporations, alleging four claims of breach of contract and one claim of willful interference with contract. Bell Lavalin also sought to pierce the corporate veils of Conam Construction and Champion Constructors to reach the assets of Cimarron Holdings and CIRI.

The trial court granted the Lavalin parties' motions to dismiss Conam's fraud and professional negligence claims and Conam's motions to dismiss Bell Lavalin's claims for willful interference claim and breach of contract. The trial court cited as its reason for dismissing Conam's failure to adequately establish a basis for the jury to determine the amount of damages stemming from the Lavalin parties' malpractice.

The jury found for Conam on its breach of contract and abandonment counts and awarded Conam, $4,230,898.42.[5] The jury found against Conam on the piercing the corporate veil and joint venture counts and the breach of duty of good faith and fair dealing claim. The jury found against Bell Lavalin on its breach of contract counterclaims.

Conam appeals the dismissal of its professional negligence claim and the giving of Jury Instruction 35 on piercing the corporate veil. Bell Lavalin cross-appeals the jury's verdict awarding Conam contract damages.

## II. *Discussion*

### A. JURY INSTRUCTION 35

▉ All parties agree that Conam did not object[6] to Jury Instruction 35[7] at trial

5. With interest, attorney's fees, costs and paralegal and computer research fees, the total judgment came to $7,291,103.48.

6. To say that Conam did not object is generously understated. After long discussions, Conam commented that Jury Instruction 35 was "letter perfect."

7. Jury Instruction 35 provides:

Generally, the law regards a corporation as being separate and distinct from its shareholders. One or more shareholders of a corporation may be the alter ego of the corporation, and liable for any damages assessed against the corporation, if the shareholder or

shareholders have used the corporate form to defeat public convenience, justify wrong, commit fraud, or defend crime, and if you also find that a sufficient number of the following tests are met to satisfy you, it is more likely than not that the shareholder or shareholders did not allow the corporation to exercise an individual status, or to act as an independent entity:

A. The shareholders sought to be charged own all or most of the stock of the corporation.

B. The shareholders have subscribed to all of the capital stock of the corporation or otherwise caused its incorporation.

as required by Civil Rule 51(a).[8] Thus this court will not review the jury instruction unless the giving of the challenged instruction was plain error. *Miller v. Sears,* 636 P.2d 1183, 1189 (Alaska 1981).[9] Plain error will be found when an obvious mistake exists such that the jury instruction creates "a high likelihood that the jury will follow an erroneous theory resulting in a miscarriage of justice." *Ollice v. Alyeska Pipeline Service Co.,* 659 P.2d 1182, 1185 (Alaska 1983).

This court's ultimate determination in analyzing plain error in jury instructions is simply whether a correct instruction would have likely altered the result. *See, e.g., Hout v. NANA Commercial Catering,* 638 P.2d 186, 189 (Alaska 1981) ("unlikely ... [it] would have altered the result"); *Miller,* 636 P.2d at 1190; (imprecise jury interrogatory did not likely mislead jury); *City of Nome v. Ailak,* 570 P.2d 162, 171 (Alaska 1977) ("application of instruction sought by appellant would not have altered the result").

[3] Because of the policy underlying Rule 51(a), this court has placed a heavy burden on the appellants to prove that an error was *highly likely* determinative. We have emphasized that we will not speculate on whether. the error altered the result. *Holiday Inns of America, Inc. v. Peck,* 520 P.2d 87, 92 (Alaska 1974). Rather, the appellant must prove with some certainty that the jury was determinatively misinfluenced.

We are not persuaded that Conam has met this burden. All Conam has argued is that it had a strong case. Leaving aside a

detailed review of the evidence, it can be said that Conam presented probably a close case for piercing the corporate veil. However, this court would be speculating to say that a correct instruction would have changed the result.

Conam also argues that the exception set forth in *Zeman v. Lufthansa German Airlines,* 699 P.2d 1274, 1280 (Alaska 1985), to the general policy against reviewing issues not objected to at trial be applied in this case. In *Zeman* we held that arguments which "(1) are not dependent on new facts, (2) are closely related to the appellant's trial pleadings and (3) could have been gleaned from the pleadings" need not be expressly presented to the trial court. *Id. See State v. Northwestern Const., Inc.,* 741 P.2d 235, 239 (Alaska 1987) (applying *Zeman* ). Rather, the appellant is given leeway to "expand or refine details of an argument *otherwise* preserved on appeal." *Zeman,* 699 P.2d at 1280 (emphasis added).

*Zeman,* however, has never been extended to reviewing jury instructions. Such an extension would be inappropriate in light of the policy underlying Rule 51(a) that "counsel should make a specific objection to a given instruction, even if he has previously argued his position to the court. The trial court needs an identifiable opportunity to rule on a party's position." *Brown v. Estate of Jonz,* 591 P.2d 532, 534 (Alaska 1979). Indeed, the most liberal application of Rule 51(a) by this court was in *Girves v. Kenai Peninsula Borough,* 536 P.2d 1221, 1223 (Alaska 1975). *See Brown,* 591 P.2d at 534. In *Girves,* we considered appel-

C. The corporation has grossly inadequate capital.
D. The shareholders use the property of the corporation as their own.
E. The directors or executives of the corporation do not act independently in the interests of the corporation but simply take their orders form the shareholders in the latter's interests.
F. The formal legal requirements of the corporation are not observed.
It is not necessary that all six of these factors be found in order to conclude that the corporation is the alter ego of its shareholder or shareholders.

**8.** No party may assign as error the giving or failure to give an instruction unless the party objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which the party objects and the grounds for objection.
Alaska R.Civ.P. 51(a) (1991–92).

**9.** Ordinarily the legal sufficiency of a jury instruction is a question of law upon which this court should exercise its independent judgment. *Fairbanks North Star Borough v. Kandik Const., Inc. & Assoc.,* 795 P.2d 793, 797 (Alaska 1990), *vacated in part on reh'g,* 823 P.2d 632 (Alaska 1991).

lant's point contesting a jury instruction when, although appellant failed to state the grounds for her objection to the given instruction, appellant had objected to the refusal to give her proposed instruction and argued the issue at length. In comparison, Conam not only failed to object to Jury Instruction 35, but expressly agreed with the entire set of instructions calling them "letter perfect." Thus the trial court was afforded no opportunity to correct errors before reading the instruction to the jury. *Girves*, 536 P.2d at 1223. *See Holiday Inns*, 520 P.2d at 90. *See also State v. Dupere*, 709 P.2d 493, 498 n. 5 (Alaska 1985), *modified on reh'g*, 721 P.2d 638 (Alaska 1986) ("The fact that the trial court was aware of the State's position on the issue does not excuse the State's failure to object to the instructions when afforded the opportunity to do so."). *Zeman* requires neither an objection nor extensive argument. The *Zeman* exception is simply incompatible with Rule 51(a).

Thus, even if Jury Instruction 35 is an erroneous statement of the law of piercing the corporate veil, Conam has not met the burden of proving that the error was highly likely to alter the result. We do not need to comment on the law of piercing the corporate veil. The jury's verdict is affirmed.

### B. PROOF OF DAMAGES
#### 1. Professional negligence.

We must now determine whether Conam adequately established a basis upon which the jury could award damages resulting from the Lavalin parties' alleged professional negligence. The party seeking damages bears the burden of proof of such damages. *Alaska Airlines, Inc. v. Sweat*, 584 P.2d 544, 549 (Alaska 1978). Damages must be proven beyond speculation. *City of Whittier v. Whittier Fuel and Marine Corp.*, 577 P.2d 216, 222 (Alaska 1978). Generally, however, the degree of certainty required to establish tort damages will vary with the nature of the tort and the circumstances. *Restatement (Second) of Torts* § 912 (1979).

We have held that evidence was not sufficient to create a jury question on damages. In *Whittier Fuel*, we held that a single witness's testimony did not establish a nexus between the wrongful conduct and the loss where the issue was one of the subjective motivations of the parties.[10] 577 P.2d at 224. In *Dowling Supply and Equipment, Inc. v. City of Anchorage,* 490 P.2d 907, 909 (Alaska 1971), we found that a single witness's testimony, unsupported by business records or indications of profit margin, was insufficient.

There are two aspects to damages. The first is causation, that is, the evidence must prove that the loss was caused by the tort. The second is amount. The party seeking damages must provide the jury with a "reasonable basis" for computing the award. *Whittier Fuel*, 577 P.2d at 222–24.

Causation is the major concern. *Dowling*, 490 P.2d at 909–910 ("[t]he rule against recovery of uncertain damages is therefore generally directed against uncertainty with respect to the cause of rather than the extent of damages"); *see also* 22 *Am.Jur.2d Damages* § 486 at 567 (1988) (noting that courts are more lenient in allowing the jury to speculate as to the amount of damages after their cause has been proven). While the amount of dam-

---

**10.** The Lavalin parties cite *Whittier Fuel* for the proposition that "mere witness conclusions" are inadequate proof of *amount* to create a jury question on damages. *Whittier Fuel*, 577 P.2d at 223 (quoting *Levene v. City of Salem*, 191 Or. 182, 229 P.2d 255, 263 (1951)). However, we held in that case that the testimony of a single witness was sufficient to provide the jury with a reasonable basis upon which to calculate the amount of damages stating:

> We will not require that a plaintiff in a contract suit present an accountant's balance sheet in order to substantiate his damages.

> Once actual damages are shown and there is a reasonable basis for computing an award, a defendant's opportunity for pre-trial discovery of the evidentiary basis for the amount claimed, the right to cross-examine witnesses and to present evidence, as well as the judge's duty to instruct the jury on the issue of certainty provide adequate protection against speculative verdicts.

> *Id.* 577 P.2d at 224 (footnote omitted). We then found that the causation element was not proven with adequate certainty and modified the verdict accordingly. *Id.*

ages need not be proven with mathematical accuracy, there must be "some competent evidence" upon which to base an award. *Dowling*, 490 P.2d at 909.

The Lavalin parties contend that Conam did not meet its burden in regard to either aspect of damages. They point out that Conam's evidence consisted of one expert witness who admitted that it was impossible to segregate specific instances of negligence with the corresponding damages. They also maintain that Conam's method amounts to a "total cost" approach, which this court has disapproved.

The Lavalin parties rely on *Huber, Hunt & Nichols, Inc. v. Moore*, 67 Cal.App.3d 278, 136 Cal.Rptr. 603 (5th Dist.1977). In *Huber*, a contractor sued its architect for negligent design and supervision. *Id.* 136 Cal.Rptr. at 609. The contractor attempted to recover as damages the difference between the amount bid and the amount actually spent. The court held that the contractor could not maintain an action for negligence without proving the measure of damages with specificity. The "total cost" approach used to estimate damages did not adequately establish causal connection between the architect's negligence and the cost overruns. *Id.* at 621–23.

*Huber* noted that the total cost method required the jury to assume five things: the contractor's original estimate was accurate; the cost overruns were proximately caused by the architect's errors; the errors were proximately caused by the architect's negligence; the overruns were not attributable to delays caused by factors other than the architect's negligence, and the overruns could not have been compensated for in the modification process built into the construction contract. *Id.* 67 Cal.App.3d at 297–99, 136 Cal.Rptr. 603. The court stated that this method of calculating damages would create a cause of action every time a contracting bid proved to be imprecise. *Id.* 136 Cal.Rptr. at 615.

*Huber* is apposite for the proposition that the "total cost" approach is disfavored for calculating tort damages.[11] Conam argues that the concerns with the total cost approach are not applicable in torts, because part of the reason the total cost method is disfavored is because it fails to exclude from a contract award those damages only recoverable in tort. However, the policy disfavoring the total cost approach is based on the lack of proof of proximate cause. *See Kandik*, 795 P.2d at 799 ("the plaintiff must relate the specific amount of increased costs to the particular breach"). Proximate cause is just as much an element of tort damages as it is an element of contract damages. The weakness in Conam's evidence is in proof of causation, not, as the Lavalin parties contend, amount. Conam's method required the jury to make only one of the assumptions which concerned the *Huber* court: the jury would have to assume that all the overruns were traceable to appellees' errors and omissions.[12] Conam was actually able to provide the jury with some numerical reference for calculating the amount of damages.[13]

---

**11.** This court has previously held that the total cost approach was disfavored for contract damages. *Fairbanks North Star Borough v. Kandik Construction, Inc. & Assoc.*, 795 P.2d 793, 798–99 (Alaska 1990), *vacated in part on reh'g*, 823 P.2d 632 (Alaska 1991).

**12.** The other assumptions are not applicable on these facts. The original bid is not relevant to the issue of damages. The trial court admitted that there was a jury question on negligence, even though it was a weak case. Conam is alleging a failure of the CCR process, so a jury should not assume that some of the overruns were addressable there. Lastly, Conam supplied evidence of other potential delays for the jury to consider.

**13.** With respect to the lesser requirement of valuation, Conam contends that it established an adequate basis for assessing damages by setting out a range from which the jury could select the appropriate award. The floor of this range is the amount of contract damages which the jury calculated as $4,230,898.42. The ceiling of the range is $6.3 million which represents what Conam's expert testified was the difference between how much Conam was paid and how much it spent. This leaves a range of less than $2.1 million from which the jury could select.

Conam contends that the amount of contract damages is an accurate floor because contract damages will necessarily be a subset of tort damages. This is because tort damages include all items which could be contract damages plus some which are not available under contract

 Conam's primary evidence on negligence was the testimony of its expert, Bruce Campbell. Campbell identified three areas in which the appellees' negligence caused cost overruns. First there was the failure to provide job-specific specifications which changed the nature of the project from design/build to fast track construction.[14] This change directly led to increased costs and delays.[15] Second, Campbell testified about inconsistent specifications for the required weld quality, noting that the criteria were changed after 80% of the welds had been done. Again, delays resulted.[16] Third, Campbell addressed the CCR modifications. Campbell testified that Bell Lavalin's modifications of its CCRs and skimming from the ARCO grants resulted in between 45 and 80 days delay.

Campbell attempted to isolate the cause for the delays. For one delay, he proposed three possible sources: authorized changes in the schedule; lack of plans and specifications; and Conam's understaffing or other inefficiency. Campbell was able to eliminate the first possibility because there was no evidence of a schedule change in the weekly reports. Likewise, Campbell was able to eliminate Conam's inefficiency because the weekly reports show no evidence of understaffing or complaints by Partec, the construction manager. Thus for at least some delays, Campbell was able to formulate an opinion that the appellees' conduct was the proximate cause of the delay.

However, Campbell admitted that he was limited in proving direct causal links.[17] Many of his calculations on delays and costs were pure estimates. His methods looked at the effect of the negligence on the whole project, rather than creating a link between a specific delay and a specific cost.[18]

theories. This amount may properly be considered on appeal because the same evidence with which the jury calculated the contract damages was available to calculate tort damages. The net expenditure is an appropriate ceiling because it represents the upper limit of damage to Conam and could be lowered if the jury found adequate proof of comparative negligence.

Conam attempted to quantify the damages with more specificity throughout its expert testimony, but admitted it was difficult. In discussing the change order process, however, Conam's expert was able to derive dollar amounts which could provide the jury with a reasonable basis for calculating damages. For one set of CCRs, Conam was able to calculate a definite amount.

14. Bruce Campbell testified that in a design/build project, the contractor has the complete plans for the whole project before building begins. In a fast track project, the design and construction occur simultaneously as the project goes along. Because the design is subject to constant change and revision and the construction cannot be planned ahead, a fast track project can be considerably more expensive.

15. Campbell attributed a one month delay in coating the interior of the tanks, at 55 employee-hours a day, to the failure to provide specifications for what degree to grind the sharp edges within the tanks. The specifications provided to Conam called for "coatable surface," a nebulous specification.

16. Campbell outlined the delays:
We had very definite defined delays that occurred in the tanks. We had a three day delay that occurred in June during the stop work order, and the tanks were initially being coated in the State of Washington. And, then we got a 17–day delay when Rockford exited the job and later—later came back. So, that's about 20 days there that are pretty well defined. In addition, it's pretty well defined in the record that painting could have started, coating could have started in the interior of Tank a, CPF 2 on about the first week in September, and it didn't start until about the first week in October, and that was caused, among other things, by the grinding that was required in that tank, and that added about another thirty days to the process. So, what I've done is I've taken those—and, I say those items are particularly access—particularly accessible to the lack of having end result and job specific specifications. And, I think that in my analysis, in my book.... I finally ended up with an amount which I determined to be approximately 54 days.

17. Campbell testified as to his general conclusion:
I know that the total money spent by Conam in performing approximately 87 percent of the work was roughly 11.7 million dollars. I know that they were paid approximately 5.4 million dollars. And, all I can say is that a portion of that difference is attributable to the lack of engineering.

18. Rather than subtract out specific parts of the project which Conam did not perform, Campbell instead took the value of the entire project and calculated the value of Conam's work to be 87% of the entire project to reflect that in total Conam performed 87% of the contract.

Further, Campbell admitted that the actions of ARCO, and perhaps even Conam, may have contributed to the cost overruns.[19] Campbell was not able to separate out plan delays which may have been caused by ARCO's changes. Also, Campbell did not account for the amounts ARCO paid for some of its damages in a settlement with Conam. Campbell repeatedly referred to concurrent factors which might have led to delays, but which he could not quantify. Basically, all Campbell could testify to was that "a portion" of the cost overrun was attributable to the engineering negligence.

The other weakness in Conam's proffered evidence is quantifying the damages traceable to the separate conduct of Bell Lavalin and Partec.[20] Conam admitted that Campbell was unable to segregate the overruns from negligence by the various appellees. Conam instead relied on other evidence, such as the project plan log, to prove which appellee was responsible for which delay.[21]

Viewing the evidence in the light most favorable to Conam, we conclude that reasonable jurors could not disagree on the damages issue. The cause of the damage which Conam claimed was never satisfactorily proven. Despite Conam's effort, cause remained too speculative to submit the issue of damages arising from professional negligence to a jury.

### 2. Breach of contract.

■ The jury found that Conam's nonperformance was excused and Conam was entitled to damages because 1) Bell Lavalin breached a mutual agreement to give Conam the time extension including the winter shutdown; and 2) Conam's nonperformance was excused because of commercial impracticability. Either finding alone was adequate for Conam to be entitled to damages. Thus, in order to reverse the award of contract damages we must overturn both of the jury findings.

### a. *Discharge of Performance Duty.*

In the Brief of the Cross–Appellants, Bell Lavalin urges this court to overturn the jury verdict which found that Conam's nonperformance of the contract was excused because of Bell Lavalin's breach of its mutual agreement to grant a time extension.[22] The thrust of its argument is that although a promise of a time extension and a winter shutdown was made and breached, public policy underlying construction subcontracts requires that the promise not be recognized as enforceable.[23]

---

**19.** Campbell's testimony left it unclear whether ARCO was negligent in failing to provide job-specific specifications initially or whether it was all Bell Lavalin's negligence in using the general specifications provided by ARCO. With respect to Conam, Campbell admitted that Conam had overrun some of its estimates despite working efficiently.

**20.** In fact, Conam waived its appellate claim against FRB on this issue because it could not isolate that part of its damages which were separately caused by the negligence of FRB alone.

**21.** Campbell was only able to say that FRB was responsible for the design below the vertical support member (VSM) beam and Partec for the design above the VSM beam. Conam also argues that if vicarious liability is established as set forth above, it does not matter who caused the damages.

**22.** This request amounts to a review of the denial of Bell Lavalin's motions for directed verdict and judgment n.o.v. on the issue of whether Conam was justified in terminating its perfor-

mance and seeking damages for Bell Lavalin's breach of contract. The appropriate standard of review is whether the evidence, viewed in the light most favorable to the non-moving party, is such that reasonable minded jurors in the exercise of prudent judgment could not differ in their decision as to the facts. *Clark v. Greater Anchorage, Inc.,* 780 P.2d 1031, 1034 (Alaska 1989).

**23.** Bell Lavalin argues that principles of construction law recognize that subcontractors are placed in a difficult position. It contends that it is vital in construction subcontracts that the contractor retains control to schedule and reschedule the project as needed without doubting that the subcontractor will walk off the job because such rescheduling amounts to a breach of a promised schedule. Bell Lavalin argues: "A central, absolutely controlling ingredient in virtually every construction contract is a mutual commitment that the job will be prosecuted to completion regardless of problems which are inherent in construction, including sometimes arbitrary changes which may be decreed by the owner, defects in the design, unanticipated site

Conam replies that the grant of the time extension was not a modification but rather part of the existing contract.[24] It further argues that it had fulfilled all of the requirements for receiving an extension and that Bell Lavalin had conceded that Conam was entitled to one.

In its reply brief, Bell Lavalin apparently abandons many of its earlier arguments and concedes that an enforceable promise to grant a time extension with a winter shutdown existed and was repudiated. Instead, Bell Lavalin argues that the breach was only a partial breach and that it was not sufficient justification for walking off the job. It cites the *Restatement (Second) of Contracts* §§ 237, 241 (1979) as authority that only a "material" or "total" breach of a contract relieves a party of its duty of performance. It then sets out that the breach was not in fact material.

According to Alaska Appellate Rule 212(c)(3), a reply brief may not raise contentions not previously raised in either the appellant's or appellee's briefs. Alaska

R.App.P. 212(c)(3). Although, Bell Lavalin argues in its opening brief that generally the breach of this promise should not justify termination,[25] it raises the theory of partial and nonmaterial breach for the first time in its reply.[26] Thus, this court need not even consider the issue.

Even if the argument is considered, it is unpersuasive. The jury was instructed on materiality and it is undisputed that the instruction was proper. The jury was instructed that "termination is justified only in the event of a total breach." A "total breach" was defined for them as one which "so substantially impairs the value of the contract to the injured party at the time of the breach, that material inconvenience or injuries will result if the injured party is forced to complete its performance and make a claim for damages." The jury was then given the same set of factors for determining "totality" which Bell Lavalin set out in its reply brief.

Bell Lavalin has not put forward any evidence which indicates that the fair mind-

---

conditions, extraneous interference by third parties, and the inevitable weather factor." Thus, the modification must be analyzed with strict scrutiny before it can be enforced in place of the "carefully crafted" contract provisions. Moreover, Bell Lavalin contends that its promise was insufficiently definite to be enforceable.

Bell Lavalin also argues that the failure of Conam to walkoff the project at the time of the repudiation amounts to a waiver of its right to terminate performance. However, this argument is supported only by a reference to the *Restatement of Contracts* § 317(2) (1937). This provision of the first Restatement was repudiated in *Restatement, (Second) of Contracts* § 378 (1981). Therefore the Lavalin parties argument for election of remedies and waiver is not persuasive.

24. Conam refers to ¶ 89(c) of the subcontract.

25. Bell Lavalin asserts that "[t]he issues which must be addressed concern, first, the nature and weight of proof which is required to establish the existence and terms of an oral amendment to a integrated written contract; and, second, the nature of the conduct by a general contractor which justifies termination of work by a subcontractor." With respect to the second issue, the Brief of the Cross–Appellants read as follows:

The subcontract, Exhibit 233, represents an almost absolute commitment by Conam to

proceed with and complete the work in accordance with Bell Lavalin's schedule, conditioned only upon Bell Lavalin's commitment to pass on progress payments which Bell Lavalin received from the owner. The parties provided for changes in the work, defects in the plans, scheduling and rescheduling of the work by Bell Lavalin to accommodate the owner, resolution of disputes between the resident construction manager and the subcontractor and, if necessary, for the arbitration of disputes between Conam and Bell Lavalin. There is simply no evidence of any conduct by Bell Lavalin which released Conam from its commitment to complete the work.[29]

(Footnote 28 omitted). No further argument is made on this point.

29. Bell Lavalin admits, for the purpose of this motion, that if a promise of a winter shutdown (as opposed to an indefinite time extension) was made to Conam, that Bell Lavalin did breach that promise.

26. Bell Lavalin's shift in gravamen is manifested by the argument headings used in its briefs. In the opening brief, the heading reads: "The trial court erred in submitting to the jury Conam's theory of a promise by Bell Lavalin to grant a time extension including a winter shutdown." In the reply brief the heading reads: "Was the failure of Bell Lavalin to grant Conam a time extension under the circumstances in this case an event which justified the termination of work by Conam?"

ed jurors could not differ on this issue. We thus have no reason to overturn the jury's verdict.

b. *Commercial Impracticability.*

Because we conclude that the jury's finding of breach of contract is supported by the evidence, we need not address the issue of its finding of commercial impracticability.

### III. *Conclusion*

We AFFIRM the jury's determination that the corporate veil should not be pierced. Even if Jury Instruction 35 was an improper statement of the law on piercing the corporate veil, we will not consider it. Conam failed to object to the instruction at trial and has not met its burden of proving that giving Instruction 35 was plain error highly likely determinative.

We AFFIRM the superior court's directed verdict in favor of Bell Lavalin and Partec on the claim of professional negligence.

We AFFIRM the jury's verdict awarding Conam damages for Bell Lavalin's breach of contract.