**AVIATION ASSOCIATES, LIMITED, a California Limited Partnership, and Charles F. Slagle, Appellants,**

v.

**TEMSCO HELICOPTERS, INC., Appellee.**

No. S–5223.

Supreme Court of Alaska.

Oct. 7, 1994.

James A. Parrish, Parrish Law Office, Fairbanks, for appellants.

H. Clay Keene, Keene & Currall, Ketchikan, for appellee.

Before MOORE, C.J., and RABINOWITZ, MATTHEWS and COMPTON, JJ.

## OPINION

RABINOWITZ, Justice.

### I. BACKGROUND

The central issues in this appeal concern whether the superior court correctly instructed the jury regarding a covenant-not-to-compete entered into between Charles Slagle and TEMSCO Helicopters, Inc. and concern regarding the calculation of liquidated damages for violations of the covenant.

Slagle developed Westflight, a Ketchikan commercial air taxi business. Aviation Associates (AA) subsequently assumed ownership of Westflight with Slagle as the only general partner. As a consequence of intense competition from Westflight, in September 1986 TEMSCO Helicopters, Inc. (TEMSCO) purchased Westflight, agreeing to a purchase price of $1,000,000 for its goodwill and $500,000 for its other assets. As part of the sale, Slagle agreed to a seven-year covenant-not-to-compete.

This covenant provides in part:

AVIATION and Charles F. Slagle ("SLAGLE") for a period of seven (7) years from the effective date of this agreement shall not, directly or indirectly, whether as an owner, shareholder, director, agent, employee, investor, or in any other capacity whatsoever compete with TEMSCO, or its successors or assigns, in the operation of a commercial air taxi business authorized to do business under Sections 401 and 135 of the Federal Aviation Act of 1958, within all areas of Alaska south of Yakutat.[1]

The sales agreement (agreement) between Westflight and TEMSCO further provides for liquidated damages as follows:

In the event AVIATION or SLAGLE violate the noncompetition covenant set forth in Paragraph 14, ... AVIATION shall pay for each day of a violation the sum of One Thousand Dollars ($1,000.00) which the parties hereto agree to be reasonable compensation to TEMSCO, not a penalty, for such violation. . . .

On October 1, 1988, Slagle began working for Seley Corp. (SECO). Subsequently, he managed SECO's Salmon Falls Resort. SECO conceived of a "Five Star Tour," which would include lunch and a nature walk at the Salmon Falls Resort, a flightseeing trip to Misty Fjords, and a bus tour. On November 13, 1989, Slagle and others met and agreed that the tour price would be $159.00. On April 30, 1990, Wilderness Resorts, Inc. was incorporated with SECO and ProMech, Inc. as owners. At this time Wilderness Resorts d/b/a ProMech Air, a business name used by ProMech and Wilderness Resorts, was issued a Section 135 air taxi permit. The Five Star Tour operated eighty-six days in 1990, with three companies, including ProMech Air, providing air taxi services.

TEMSCO instituted the underlying suit on February 28, 1991, claiming that Slagle's involvement in the Five Star Tour constituted a violation of his covenant-not-to-compete.[2] Slagle terminated his employment with

---

1. Section 401 refers to the Federal Aviation Act of 1958, § 401(d), 49 U.S.C. § 1371(d) (1976), which governs certification of commercial air taxis. Section 135 refers to 14 C.F.R. § 135, which governs various commercial air taxi services including "air commerce of persons or property for compensation or hire as a commercial operator" that do not exceed specified seating and payload capacities. 14 C.F.R. § 135.-1(a)(3) (1992).

2. Witnesses at trial testified that Slagle personally contacted and negotiated with local air taxis, with the exception of TEMSCO, to solicit their participation in the Five Star Tour; actively solicited TEMSCO's customer, Grayline/Holland America; actively undertook the creation and implementation of Wilderness Resorts' air taxi business; controlled Wilderness Resorts' air taxi participation in the Five Star Tour and flights to the Metlakatla Reservation for Grayline/Holland America's Metlakatla Tour; inquired into purchasing planes for SECO; negotiated how to divide the Five Star Tour fare; undertook efforts to obtain Part 135 insurance; led insurance agents to believe that he would personally select ProMech Air's pilots; made quality control suggestions to the air taxis; gave orders to ProMech Air employees; and was responsible for Five Star Tour's scheduling logistics.

SECO on that date. The jury returned a special verdict in TEMSCO's favor, finding that Slagle had violated the covenant for a period of 473 days, commencing on November 13, 1989 and continuing through February 28, 1991. The superior court subsequently entered judgment for TEMSCO in the principal amount of $473,000.00, with $71,980.32 in prejudgment interest, $5,111.31 in costs, and $51,800.00 in attorney's fees, for a total judgment of $601,891.63. This appeal followed.

## II. DISCUSSION

### A. The Issues on Appeal [3]

■ In this appeal AA argues that the superior court's jury Instruction Nos. 16, 18, and 19, regarding the scope and the proper application of Slagle's covenant-not-to-compete, and Instruction No. 22, regarding the calculation of liquidated damages for violation of the covenant, constitute reversible errors.[4]

### B. Interpretation of the Covenant–Not–To–Compete

Before examining AA's specifications of error relating to the superior court's jury instructions, reference should be made to the superior court's interpretation of the covenant-not-to-compete, which shaped the instructions now in question. Initially, the superior court ruled that

a fair reading of [the covenant] in light of the evidence adduced at the preliminary injunction hearing and in light of reason and common sense regarding commercial

affairs leads the court to conclude that the intent of the parties and the meaning of the provision is that Aviation and Slagle were forbidden by the covenant to have any substantial connection with an air taxi business in Southeast Alaska operating under Sections 401 and 135 of the Federal Aviation Act. It was the purpose of this provision to prevent Aviation and Slagle from having any direct or indirect influence or impact on Temsco's business, its strategic decision making, or its profits.

Subsequently, the superior court further ruled:

The claim by Aviation Associates and Slagle that they are forbidden only to operate an air tax [sic] simultaneously holding certificates under both Section 401 and Part 135 is a *possible* reading of the covenant, but it was not the reasonable expectation of the parties and it is not a reasonable reading in light of the whole record of the relationship between the parties and the commercial context in which the transaction took shape.

■ We are of the view that the superior court's construction of the covenant-not-to-compete was not erroneous and that it correctly applied its interpretation in fashioning the instructions which are questioned in this appeal. The key to the superior court's interpretation of the covenant-not-to-compete is its conclusion that Slagle's activities in air taxi competition with TEMSCO necessarily had to be "substantial" in nature before the jury was permitted to find that a violation of the covenant had occurred.[5]

---

**3.** AA has also specified as error the superior court's denial of its motion to compel TEMSCO to respond to its discovery requests. The superior court ruled that AA's requests for discovery were overly broad and as a consequence granted TEMSCO's request for a protective order.

We decline to review this specification of error. AA's appellate briefing of this issue is entirely too cursory to warrant review. *See Gates v. City of Tenakee Springs,* 822 P.2d 455, 460 (Alaska 1991).

**4.** Jury instructions involve questions of law, which we review under an independent judgment standard. *Beck v. State, Dep't of Transp. & Pub. Facilities,* 837 P.2d 105, 114 (Alaska 1992). An erroneous statement of law in jury instruc-

tions will not be reversed unless prejudice is demonstrated. *Id.*

Generally, interpretation of contractual agreements, including covenants-not-to-compete, presents a question of law. *Fairbanks North Star Borough v. Tundra Tours, Inc.,* 719 P.2d 1020, 1024 (Alaska 1986). The primary goal of contract interpretation is to give effect to the parties' reasonable expectations. *Stepanov v. Homer Elec. Ass'n, Inc.,* 814 P.2d 731, 734 (Alaska 1991). The parties' reasonable expectations are assessed based upon the subject documents, extrinsic evidence, and relevant case law. *Tundra Tours,* 719 P.2d at 1024.

**5.** AA argues that the covenant-not-to-compete should be narrowly construed because it consti-

C. *The Instructions*

(i) *Instruction No. 16* [6]

Instruction No. 16 defines the term "substantial involvement" and defines the level and nature of the restricted involvement as only that which has "an important impact on the services of an air taxi business."

AA argues that this instruction is error because it would be liable if Slagle's "substantial involvement in the operation of an air taxi business" had a "major impact on the planning, equipping or operation of an air taxi business." According to AA, this instruction deemphasizes that Slagle must himself "operate" a competing air taxi business before a violation of the covenant exists.

▬ Under Alaska Civil Rule 51(a), "[n]o party may assign as error the giving or the failure to give an instruction unless the party objects thereto before the jury retires to consider its verdict, *stating distinctly the matter to which the party objects and the*

grounds of the objection." (Emphasis added). The purpose of this rule is to afford the trial judge an opportunity to correct the instruction before it goes to the jury. *Drickersen v. Drickersen*, 604 P.2d 1082, 1085 n. 3 (Alaska 1979). In the absence of a proper objection, this court will not review a jury instruction unless the instruction constitutes plain error.[7] *Conam Alaska v. Bell Lavalin, Inc.*, 842 P.2d 148, 153 (Alaska 1992). TEMSCO contends that AA generally failed to adequately object to the jury instructions at trial, thereby waiving the right to appeal from the giving of this instruction. We agree with TEMSCO with regard to this instruction.

▬ AA advocated the requirement that Slagle be "involved substantially in the operation of a commercial air taxi business" so it cannot now complain of this portion of the instruction. Additionally, AA cannot claim on appeal that the "major impact" language

---

tutes a restraint on trade. Our decisions have distinguished between covenants-not-to-compete which are ancillary to sales agreements and employer-employee covenants. *Compare Wirum & Cash Architects v. Cash*, 837 P.2d 692 (Alaska 1992) (involving a partner's withdrawal from a partnership); *National Bank of Alaska v. J.B.L. & K., Inc.*, 546 P.2d 579 (Alaska 1976); *Barber v. Northern Heating Oil, Inc.*, 447 P.2d 72 (Alaska 1968); *with Data Management v. Greene*, 757 P.2d 62 (Alaska 1988); and *DeCristofaro v. Security National Bank*, 664 P.2d 167 (Alaska 1983). As one court has noted,

> where ... the noncompetition covenant was ancillary to the sale of a business, it may be interpreted more liberally.... Under such circumstances, the parties presumably bargain from positions of equal bargaining power.

*Centorr–Vacuum Industries, Inc. v. Lavoie*, 135 N.H. 651, 609 A.2d 1213, 1215 (1992) (citations omitted).

Even construing the covenant-not-to-compete strictly, we are not persuaded that the superior court's interpretation is erroneous.

6. Instruction No. 16 reads in full:

The term "substantial involvement in the operation of an air taxi business" has no precise definition; there is no checklist of technical characteristics that tells you exactly when such involvement has occurred. Rather, the test is a practical one that requires you to consider all the facts and circumstances in reaching a judgment about the extent of any involvement.

Initially, you should understand that involvement in the operation of a commercial air taxi business can be almost non-existent, as where

the person is the custodian of the building or delivers the mail or office supplies to the operation. At the other extreme, one can have intense, constant, day-to-day involvement, as when one is the manager or pilot for the operation. In the first example, the involvement is not substantial; in the latter examples, the involvement is very substantial. As you can see, there is a range or continuum of involvement from slight involvement to intense involvement. A slight involvement by Slagle would clearly not be a violation of the agreement; an intense involvement would clearly be a violation of the agreement.

Thus, to be substantial, the involvement must be more than slight involvement. It must be involvement that has a major impact on the planning, equipping, or operation of an air taxi business. To be substantial, the involvement need not be constant; it may be intermittent. It need not be involvement on site; it may be by means of written or telephonic consultation or direction. And it need not directly impact routine operations; it may consist of decision-making on questions of finance, marketing, and strategic planning for an air taxi business. But, as noted, the involvement must have an important impact on the success of an air taxi business.

7. Plain error exists when a jury instruction obviously creates " 'a high likelihood that the jury will follow an erroneous theory resulting in a miscarriage of justice.' " *Conam Alaska*, 842 P.2d at 153 (quoting *Ollice v. Alyeska Pipeline Serv. Co.*, 659 P.2d 1182, 1185 (Alaska 1983)).

was error because it advocated this language below. The record does not indicate that AA adequately objected to the language "planning, equipping or operation of an air taxi business."[8] AA therefore failed to preserve this point for appeal. Furthermore, we conclude that no plain error exists.[9]

### (ii) *Instruction 18*

Instruction 18 states in part:

An air taxi business is in competition with Temsco if it is ... taking substantial steps that ultimately result in the provision of air taxi services in competition with Temsco. Such substantial steps include: the acquisition of aircraft for air taxi operations by purchase, charter, lease, joint venture, or other means; entering into agreements with suppliers; entering into agreements with joint venturers to provide or complement the air taxi services; acquiring the use of premises for the conduct of the business; and acquiring financing or insurance for the business. At the time any substantial steps were taken, the air taxi business need not have had a valid certificate under Section 401 or Part 135 of the federal aviation statutes or regulations to be a competitor; but the substantial steps mentioned above had to ultimately result in the provision of Section 401 or Part 135 air taxi services in competition with Temsco.

AA argues that preparatory steps should not constitute competition in violation of the covenant.[10] If we agreed with AA's interpretation, the instruction would be prejudicial, since the jury found that Slagle's breach began on November 13, 1989, months before Wilderness Resorts d/b/a ProMech was incorporated and issued a Section 135 air taxi permit.

■ We conclude, however, that the instruction correctly interprets the covenant. The superior court derived the substantial step test from *De Long Corp. v. Lucas*, 176 F.Supp. 104 (S.D.N.Y.1959), *aff'd*, 278 F.2d 804 (2d Cir.1960), *cert. denied*, 364 U.S. 833, 81 S.Ct. 71, 5 L.Ed.2d 58 (1960). That case also involved a covenant-not-to-compete.[11] *Id.* at 122. The covenantor, Lucas, claimed that he did not violate the covenant although he engaged in actions ultimately resulting in competition with De Long, because those actions "amounted merely to preparation to compete which never ripened into actual competition until after the no-competition period had expired...." *Id.* at 122–23. The *De Long* court rejected this argument and held:

Mere planning may not in itself constitute competition. But where, as here, affirmative steps are taken which go beyond the planning stage, planning ripens into actual competition.

*Id.* at 123.

As in *De Long*, Instruction No. 18 does not allow the jury to find that mere planning constitutes a violation of the covenant except where substantial steps are taken which "ultimately result" in competitive air taxi services. The covenant itself and the extrinsic evidence support interpreting the covenant as prohibiting such substantial steps, since the parties intended that the covenant would prevent Slagle from setting up a new air taxi business in competition with TEMSCO.

8. AA stated below, "[he] was involved—I just don't know that it is an impact on the planning or equipment is [sic] a violation." This vague objection alone cannot satisfy the requirements of Civil Rule 51(a).

9. Instruction Nos. 16, 18, 19, and 22 should be read against an evidentiary record which discloses ample support for the jury's finding that Slagle had substantial involvement in the operations of competing air taxi businesses after he had entered into the non-competition agreement with TEMSCO. *See supra* note 2.

10. AA additionally argues that the court omitted the concept of "commercial" from the concept of "air taxi business." When read as a whole, the jury instructions clearly require a finding that the air taxi service was commercial, that is, certified under Sections 401 or 135, before any violation would ensue. In any case, AA fails to allege any prejudice resulting from use of the term "business."

11. The *De Long* covenant stated that Lucas was " 'not to compete or assist anyone to compete' with [De Long] 'in any business' relating to his former employment....'" for a period of two years. *Id.* at 108.

We further note that the case at bar is distinguishable from *Wirum & Cash Architects v. Cash*, 837 P.2d 692 (Alaska 1992), which also involved a covenant-not-to-compete. In that case, we stated in dictum that where no services were rendered prior to expiration of the no-compete period, no violation existed. *Id.* at 710. Specifically, the covenantor had submitted a bid during the no-compete period, but "no negotiations had occurred, no contract was signed, no work was performed, nor was a proposal predicate to negotiating the fee for services prepared." *Id.* In the instant case, Slagle's preparatory steps matured into active competition through the creation and implementation of the Five Star Tour during the period the covenant was in force. Furthermore, more than mere submission of a bid has been proven here. Testimony at trial demonstrates that Slagle was extensively involved in the planning, formation, and management of Wilderness Resorts' and the Five Star Tour's air taxi operations.

To interpret the covenant as suggested by AA would render the covenant meaningless in important respects. For example, under AA's theory Slagle could develop a competing air taxi business and withdraw prior to its certification under Sections 401 or 135, without violating the covenant. Such a result would defeat the parties' intent and reasonable expectations embodied in the covenant. Based on the circumstances in this case, we hold that Instruction 18 is not erroneous since it accords with the covenant's provisions and the parties' reasonable expectations as interpreted by the superior court.

### (iii) *Instruction No. 19*

Instruction No. 19 states:

Under the agreement, Slagle is forbidden to have substantial involvement, direct or indirect, in any capacity, with a competing air taxi business. This means he cannot manage or fly for a competing air taxi business. But it also means he cannot own, finance, *direct,* control, supervise, or *give advice of a significant nature to a competing air taxi business* personally or through others. And this prohibition applies even against involvement *for the benefit of another,* such as his employer; Slagle is forbidden to compete himself, and he is forbidden to help others compete.

(Emphasis added). AA argues that the highlighted language was contrary to its theory that Slagle, as manager of the Salmon Falls Resort, merely acted as a consumer of air taxi services. The superior court was under no obligation to tailor the jury instructions to arguments made by AA. *Cf. Clary Ins. Agency v. Doyle,* 620 P.2d 194, 201 (Alaska 1980) (holding that *plaintiffs* are ordinarily entitled to instructions consonant with their theory of the case, where evidentiary support for the theory exists). AA advocated instructing the jury that "[i]solated acts of assistance by Slagle, if any, done occasionally and voluntarily for the convenience or accommodation of a commercial air taxi business . . . are not in violation of the parties' agreement." AA's proposed instruction, in contrast to Instruction No. 19's interpretation of the covenant's scope, would grant Slagle far too much leeway to compete with TEMSCO. We hold that, read in conjunction with Instruction Nos. 16 and 18, Instruction No. 19 correctly delineates the scope of Slagle's permissible activities under the covenant.

### (iv) *Instruction No. 22*

Under Instruction No. 22, the jury determined that liquidated damages should be assessed for 473 days of violations.[12] Instruction No. 22 states:

3. When did the competition first start?
Nov. 13, 1989 (enter date)
4. On how many days, if any, was the air taxi business in competition with Temsco (as a result of Slagle's involvement) up to and including February 28, 1991.
473 (enter number)

---

12. In regard to Slagle's violations of the covenant the jury returned in part a special verdict in which it found as follows:
2. Was the air taxi business, as a result of Slagle's involvement, in competition with Temsco?
YES (yes or no)
If your answer is "yes," go on to 3, 4, 5 and 6; if your answer is "no," enter judgment for Slagle on p. 2.

You must also decide how long any competition caused by Slagle's substantial involvement continued. Specifically, you must decide the date or dates when the competition, if any, began and the date or dates it ended.

Please note that your focus must be on competition *caused by Slagle's substantial involvement;* any competition by an air taxi business that was not caused by Slagle's substantial involvement in the business does not count.

For purposes of this instruction, Slagle's involvement, if any, caused the competition if his involvement was a substantial factor in bringing about the competition such that the competition would not have occurred had Slagle not become involved. Slagle's involvement need not have been the sole substantial factor; it had only to be one substantial factor.

The competition, if any, began when Slagle's involvement caused an air taxi business: (1) to offer in the market place the same or similar air taxi services as TEMSCO; or, (2) to solicit trade or patronage from the same class of customers as TEMSCO; or, (3) to take substantial steps toward providing air taxi services in competition with TEMSCO.

The competition, if any, stopped when the competing air taxi business either stopped offering the services or soliciting the trade or patronage referred to in the preceding paragraph, or its competition ceased being the result of Slagle's involvement and became instead the product of that business's own separate initiatives.

Please note also that, under this instruction, competition may have begun before any planes flew and may have continued after Slagle ceased working for Seley Corporation or its affiliated corporations on February 28, 1991.

I instruct you that, as a matter of law, the competition, if any, did not begin prior to November 13, 1989. You may find that competition began on that date, a later date, or at no time; but you cannot find that competition began before November 13, 1989.

■ AA's primary attack on this instruction appears to be that damages could be assessed under this instruction "for each day of competition that was caused by Slagle's involvement even if, at the time of the competition, he was not violating the covenant." AA also uses the metaphor discussed by the parties below—if Slagle created a monster, AA claims that Instruction No. 22 allowed liquidated damages for each day of that monster's life. This argument is misplaced for two reasons. Instruction No. 22 limits the time when damages may be assessed to the period during which competition is the result of Slagle's substantial involvement.[13] When read with the other instructions which explain the concept of substantial involvement, Instruction No. 22 does not encourage a "runaway verdict, far out of proportion to any violations Slagle may have committed," as contended by AA. We note that although Instruction No. 22 explicitly permitted liquidated damages on days after Slagle terminated his employment with SECO, the jury in its special verdict did not find that any violations occurred after that date. The jury's special verdict found violations only for a period of time in which ample evidence supported finding that Slagle was substantially involved in a competing air taxi operation.

■ For the reasons stated earlier, we also conclude that Instruction No. 22 correctly permitted liquidated damages to be assessed during the period before a Section 135 permit was issued. Likewise, we reject AA's argument that violations could only occur on days in which competing air taxis operated flights. Competition entails more than actual air taxi flights—it can involve soliciting customers, obtaining supplies, negotiating agreements regarding air taxi-related business ventures, and acquiring financing or insurance for entities in competition with TEMSCO. Under AA's theory, Slagle would not have been in competition with TEMSCO even if he contacted TEMSCO customers seeking their business, provided an air taxi flight did not operate on that day.

---

**13.** Substantially, Instruction No. 22 does not permit liquidated damages if the competition was no longer the result of Slagle's involvement, but another's efforts.

### III. CONCLUSION

We hold that AA failed to preserve its arguments regarding Instruction No. 16 and that Instruction No. 16 does not constitute plain error. Instruction Nos. 18, 19, and 22 are not erroneous. The judgment entered by the superior court is AFFIRMED.