Jason Edward REANDEAU, Appellant,

v.

STATE of Alaska, Appellee.

No. A–10469.

Court of Appeals of Alaska.

Oct. 28, 2011.

G. Blair McCune, Wasilla, for the Appellant.

Kenneth M. Rosenstein, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Daniel S. Sullivan, Attorney General, Juneau, for the Appellee.

Before: COATS, Chief Judge, MANNHEIMER, Judge, and ANDREWS, Senior Superior Court Judge.*

## OPINION

MANNHEIMER, Judge.

Jason Edward Reandeau was convicted of second-degree sexual abuse of a minor, two related acts of fourth-degree assault, and first-degree "failure to register" as a sex offender. (Actually, Reandeau was convicted of failing to timely file the required quarterly verification that his address had not changed.)

A portion of the State's evidence against Reandeau was physical evidence (body samples and swabs) collected under the authority of a search warrant. Reandeau argues that this search warrant was not supported by probable cause, and that the physical evidence must therefore be suppressed.

Another portion of the State's evidence against Reandeau consisted of statements that Reandeau made to a state trooper during an interview at Reandeau's home—an interview that immediately preceded Reandeau's formal arrest. Reandeau contends that, even though he had not been formally arrested, he was in custody for *Miranda* purposes during this interview.[2] Because Reandeau did not receive *Miranda* warnings, he argues that his statements to the trooper must be suppressed.

In a third claim of error, Reandeau argues that his conviction for failure to register as a sex offender must be reversed because, in the jury instructions relating to this offense, the jurors were asked to determine whether Reandeau failed to register as a sex offender—when, in fact, the State conceded that

Reandeau *had* properly registered with the Department of Public Safety as a sex offender, and the charge against Reandeau was based on the allegation that he failed to timely file the quarterly verification of his address that was due by the end of December 2007.

Finally, Reandeau argues that he received an excessive composite sentence for his four offenses (second-degree sexual abuse of a minor, two counts of fourth-degree assault, and failure to register as a sex offender).

For the reasons explained in this opinion, we conclude that the search warrant was supported by probable cause, that Reandeau was not in custody for *Miranda* purposes when the state troopers interviewed him in his home, and that the error in the jury instruction was harmless.

We further conclude that we have no jurisdiction to decide Reandeau's sentence appeal, because Reandeau's composite active term of imprisonment (*i.e.,* his composite time to serve) is within the applicable presumptive sentencing range for his most serious offense, second-degree sexual abuse of a minor.

### Underlying facts of the case

Reandeau and his girlfriend of several years, Florence D., lived in a trailer in Kodiak. Florence's 15–year–old daughter, L.S., lived with them. Florence had another daughter, Jessica S., who lived nearby.

On December 31, 2007, there was a New Year's Eve party in the trailer. Reandeau, Florence, and L.S. were all drinking, as was L.S.'s boyfriend, Ben Chichenoff. Florence got drunk during this party and she went to bed soon after the new year arrived—sometime between 12:30 and 1:00 a.m.

When Florence awoke the next morning, Reandeau was not in bed with her. Florence got out of bed and started looking around the trailer. She found Reandeau in bed with her daughter L.S. When Florence pulled back the covers, she saw that both Reandeau and

---

* Sitting by assignment made pursuant to Article IV, Section 11 of the Alaska Constitution and Administrative Rule 23(a).

2. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

L.S. were naked, and that Reandeau was "spooned" against L.S.'s back. (In other words, Reandeau and L.S. were lying on their side, with L.S. facing away from Reandeau, but cradled in his arms and lap.)

Florence became angry: she started yelling, and she pushed a television off a dresser. Reandeau got up, grabbed Florence by the hair, and pulled her down the hall. As he pulled Florence, he told her, "I'm sick of your shit, you stupid bitch!" Reandeau then opened the front door of the trailer, pushed Florence outside, and then threw her down the stairs.

Florence sought assistance at the home of her next-door neighbor. One of Florence's friends, Stacey Bushell, answered the door. When Florence told Bushell what had happened, Bushell called 911.

Later, when Florence came out of her neighbor's home to see if the police had arrived, Reandeau emerged from their trailer. Reandeau told Florence to run—and that he was going to kill her if he caught her.

Florence ran down the street, with Reandeau in pursuit. When Reandeau caught up with Florence, he grabbed her and started hitting her head up against a truck. One of Florence's male neighbors and another man came to Florence's aid, and they wrestled Reandeau to the ground.

While these men were attempting to subdue Reandeau, Florence's friend, Bushell, pulled up in her car. Florence climbed in, and then Bushell drove Florence to the residence of Florence's other daughter, Jessica S. Florence told Jessica what had happened, and she asked Jessica to go back to the trailer and get L.S. out. Jessica armed herself with a small frying pan, and then Bushell drove Jessica back to Reandeau's and Florence's trailer.

When Jessica entered the trailer and told Reandeau that she wanted to get her sister (L.S.), Reandeau attacked her: he knocked the frying pan out of her hand, grabbed her by the throat, and slammed her against the trailer wall. Reandeau also hit Jessica in the face, bloodying her lip. Reandeau then released Jessica, and she left the trailer without L.S.

Alaska State Trooper Nicholas Zito and Kodiak Police Officer Frank Peterson responded to the 911 call. They arrived at the residence at approximately 10:20 a.m. Zito's contact with Reandeau, and his interviews with several other people on the scene, are described in the next section of this opinion. Based on what he learned, Zito placed Reandeau under arrest—not for any sexual misconduct with L.S., but rather for his assaults on Florence.

Later that same day, L.S. began to feel discomfort in her anal cavity. She did not tell Zito about this. But several days later, L.S. told Kodiak Police Detective Rhonda Hosier that she remembered a dream in which it was dark, and she was lying on her stomach, and "there was pressure or something" going into her rectum.

Apparently prompted by this new information, Zito applied for a search warrant to seize body samples from Reandeau—primarily, DNA swabs of Reandeau's outer body (his penis and his hands) and the lining of his mouth, as well as pubic hairs. Analysis of the ephethelial cells (*i.e.*, skin cells) obtained from the swab of Reandeau's penis revealed that some of these cells had DNA different from Reandeau's. This DNA was consistent with L.S.'s DNA at 12 of 13 testing locations. Also, Reandeau could not be excluded as the source of DNA found on L.S.'s pajama pants.

*Reandeau's attack on the search warrant*

As we have explained, Trooper Zito obtained a search warrant authorizing him to take swabs of Reandeau's outer body and mouth lining, as well as a number of Reandeau's pubic hairs. Reandeau argues that all of this evidence was unlawfully obtained because the affidavit supporting the search warrant does not establish probable cause for the search.

To analyze this claim of error, we must summarize the information contained in Trooper Zito's affidavit supporting the search warrant application.

In his affidavit, Zito told the magistrate that the Kodiak police received a report that an older man (Reandeau) was found naked in bed with L.S. Zito and Officer Peterson ar-

rived at the residence and found Reandeau intoxicated. Reandeau told Zito that he had been sleeping in L.S.'s bed, that he had been naked, and that he was awakened by L.S.'s mother (*i.e.*, Florence), who was screaming and yelling. Reandeau said that he and Florence had been together since April 2005 (*i.e.*, for about two and a half years).

Reandeau told Zito that he did not remember going to bed, and that he did not know why he was sleeping in L.S.'s bed. However, he declared that nothing sexual had taken place between them. Reandeau admitted that he grabbed Florence by the hair.

Zito also spoke to Florence. According to Zito, Florence was both intoxicated and visibly upset during this interview; she cried uncontrollably at times. Florence told Zito that she had awakened and found that Reandeau was not in bed with her. She then went to L.S.'s bed, and she found Reandeau there. Florence tore the blanket off the bed, and she saw that both Reandeau and her daughter were totally naked, and that Reandeau was "snuggling" with her daughter.

According to Florence, she "freaked out", and then Reandeau started calling her a "stupid fucking bitch". Reandeau grabbed her by the hair and dragged her through the house to the front door, then threw her down the front steps. Florence went to her neighbor's house, encountered her friend (Stacey Bushell), and asked Bushell to call the authorities. When Florence went back outside, Reandeau was there. He told her, "Run, you stupid bitch, run!", and then he started chasing her. When he caught her, he slammed her onto the ground, and then onto the hood of a parked truck.

Zito also spoke to L.S. L.S. told Zito that her mother "started freaking out" because Reandeau was in bed with her. However, L.S. told Zito that she had been sleeping when Reandeau came to her bed, and that she at first thought it was her boyfriend. L.S. declared that "no touching" had taken place between her and Reandeau.

L.S. told Zito that Reandeau had been living with her and her mother for 2½ to 3 years, and that Reandeau was "in charge of the household": he was the one who "en-forces the rules". L.S. conceded that Reandeau had forcibly removed Florence from the trailer, "possibly" grabbing her by the back of the neck.

In Trooper Zito's search warrant application, he asserted that the foregoing facts established probable cause to believe that the body samples he was requesting (*i.e.*, body samples from Reandeau) would be evidence of the crime of second-degree sexual abuse of a minor as defined in AS 11.41.436(a)(5)(A)—*i.e.*, evidence that Reandeau engaged in sexual contact with L.S., a child under the age of 16 who lived in the same household as Reandeau, and over whom Reandeau exercised authority.

The magistrate reached the same conclusion and issued the search warrant.

On appeal, Reandeau contends that the information in the search warrant application fails to establish probable cause to believe that any crime was committed. He notes that it is not illegal, *per se,* for an adult to sleep in the same bed as an underage minor, even if both of them are naked. Reandeau further notes that both he and L.S. denied that any inappropriate touching had occurred.

All of this may be true, but the search warrant application contained a description of the surrounding circumstances which considerably heightened the implication that Reandeau had engaged in sexual contact with L.S.

From the search warrant application, it was fair to infer that Reandeau normally slept with Florence, and not with L.S. Reandeau told Zito that he and Florence had been "together" for approximately two and a half years. Florence told Zito that, when she awoke and discovered that Reandeau was not in bed with her, she began searching the trailer for him. Given Florence's angry reaction when she found Reandeau in bed with her daughter, it is fair to infer that this discovery was unexpected and disturbing to Florence. And finally, Reandeau told Zito that he did not know why he was sleeping in L.S.'s bed.

Thus, the search warrant application supports the inference that it was unusual for

Reandeau to sleep with L.S. Moreover, both Reandeau and L.S. were naked, and Reandeau was "spooning" or cuddling L.S. in a manner that would normally bring his genitals in contact with her buttocks.

The magistrate's finding of probable cause is also supported by Reandeau's reaction when Florence found him and L.S. in bed together. Rather than attempting to calm Florence and explain things, Reandeau attacked Florence both verbally and physically. He dragged her from the house, threw her to the ground, and then later chased her down the road to continue his assault. Reandeau's actions could reasonably be construed as a manifestation of his consciousness of guilt.

Reandeau relies heavily on the fact that L.S. expressly declared that there had been no sexual contact between her and Reandeau. But given the other circumstances recited in the search warrant application, L.S.'s denial would not necessarily negate the existence of probable cause. Moreover, the search warrant application suggests two reasons why L.S. might falsely deny that Reandeau had engaged in sexual contact with her.

First, L.S. told Trooper Zito that Reandeau was "in charge of the household", and he was the one who "enforces the rules". For this reason, out of fear of reprisal against her or her mother, L.S. may have been hesitant to accuse Reandeau of criminal conduct. Second, the search warrant application provides at least some reason to believe that L.S. may have felt a degree of allegiance toward Reandeau—an inference arising from L.S.'s singularly unemotional response to Reandeau's attack on her mother, and from the fact that, during and after this attack, L.S. stayed with Reandeau rather than aiding or comforting her mother.

For all of these reasons, we conclude that the search warrant application establishes probable cause to believe that Reandeau engaged in sexual contact with L.S., a minor living in the same household as Reandeau, and over whom he had authority.

Reandeau makes an alternative argument: that even if the search warrant application establishes probable cause to believe that he engaged in sexual contact with L.S., the warrant itself was overbroad, in that it authorized the police to seize body samples that would not be evidence of this crime.

The warrant authorized the troopers to obtain external swabs of Reandeau's genitals and hands, and a swab of the inside of his mouth (a "buccal" swab). The warrant further authorized the troopers to comb Reandeau's pubic hair and to seize 30 pubic hairs from him. Reandeau argues that these body samples were not relevant to prove sexual contact—that their only conceivable relevance was to prove sexual penetration, a discrete crime that was not alleged in the search warrant application and was not found by the magistrate when he issued the warrant.

We disagree with Reandeau's assertion that the body samples had no relevance to proving sexual contact. The external swabs of Reandeau's genitals and hands might yield cells that could be identified as belonging to L.S. The swab of the lining of Reandeau's mouth would provide an identification of Reandeau's DNA profile, and this DNA profile could potentially be linked to cells found on L.S.'s body. The combing of Reandeau's pubic area might yield hair or cells that came from L.S., thus tending to show that he had genital contact with her. And the pubic hairs seized from Reandeau might conceivably match hairs found on L.S.'s body. We therefore conclude that the scope of the search authorized by the warrant was not overbroad.

For all of these reasons, we uphold the search warrant.

*Reandeau's claim that he was subjected to custodial interrogation in violation of Miranda v. Arizona*

■ As we have already explained, Trooper Zito and Officer Peterson responded to the 911 call about the disturbance at the residence shared by Reandeau and Florence. When Zito and Peterson arrived, they found Jessica S. (Florence's other daughter) and her boyfriend outside the trailer. After speaking briefly to Jessica S. and her boyfriend, Zito and Peterson entered the trailer. There, they encountered Reandeau, Ben Chichenoff (L.S.'s boyfriend), and L.S. Reandeau

and Chichenoff were sitting in the front room, while L.S. was in an adjoining room of the trailer.

Zito spoke to Reandeau for about three minutes. At the end of this initial interview with Reandeau, Zito asked Reandeau to "sit tight for a sec[ond]" while he went outside to speak with the other witnesses to the altercation—Jessica S., Florence's male next-door neighbor, and Florence's friend Stacey Bushell. Before leaving the trailer to conduct these interviews, Zito expressly told Reandeau that he was not under arrest.

It took Zito about half an hour to conduct these other interviews. When Zito returned to the trailer, he spoke to Reandeau a second time—this time, for about fourteen minutes. Zito asked Reandeau questions about what had happened between Reandeau and L.S., between Reandeau and Florence, and between Reandeau and Jessica S. (when, in response to her mother's report of being assaulted, Jessica came to the trailer armed with a frying pan).

During this second interview, Reandeau and Chichenoff were seated on a couch in the living room. At the conclusion of this second interview, Zito arrested Reandeau—not for sexual abuse of a minor, but rather for his assault upon Florence.

Zito did not apprise Reandeau of his *Miranda* rights before conducting these two interviews. The superior court found that the first interview fell within the "on-the-scene questioning" exception to *Miranda*, and Reandeau does not challenge that ruling. However, Reandeau argues that he was in custody for the *second* interview, and that therefore his statements to Zito during that second interview were obtained unlawfully.

Reandeau notes that when Zito left the trailer following the first interview, he told Reandeau to "sit tight", and he left Officer Peterson in the trailer with Reandeau. Reandeau argues that a reasonable person in his position would have believed that Zito had ordered him not to leave the trailer, and that he was in fact in police custody.

Although these two factors, standing alone, might favor a finding of custody, these factors do not stand alone.

The superior court found that Zito was "calm and non-threatening" throughout his interviews with Reandeau, and that his questioning of Reandeau was "low-key". At the conclusion of the first interview, Zito explained that he wanted to leave the trailer to interview the other people involved in the altercation, and he expressly told Reandeau that he was not under arrest. Given Zito's explanation, a reasonable person in Reandeau's position would have perceived Zito's request to "sit tight" as just that—a request, rather than an order. A reasonable person in Reandeau's position would have understood that Zito, who was responding to a report of domestic violence, was trying to keep the situation under control (and the adverse parties separated) while he spoke to everyone involved and decided what to do.

This conclusion is bolstered by the fact that Zito allowed Chichenoff (who was not only L.S.'s boyfriend, but also Reandeau's friend) to remain by Reandeau's side during both interviews, even though Chichenoff was himself a witness to at least some of what happened. This conclusion is also bolstered by the fact that Zito did not order L.S. to leave the trailer.

It is true, as Reandeau notes, that Officer Peterson remained with Reandeau (and Chichenoff and L.S.) in the trailer during the half-hour interval between Zito's two interviews with Reandeau. But Peterson testified that his purpose was to "provid[e] security", because domestic violence calls are "dynamic", and the police are often unable to know "who's going to be a risk [or] a threat". Peterson also stated that he remained in the trailer to prevent the destruction of evidence, and because L.S. was still in the trailer with Reandeau.

The superior court concluded that, given these circumstances, a person in Reandeau's situation would not have perceived Officer Peterson's presence as an indication of custody. The superior court also concluded that, under the circumstances, no reasonable person in Reandeau's position would have expected Officer Zito to leave him alone in the trailer with fifteen-year-old L.S. The record supports both of these conclusions.

For these reasons, we uphold the superior court's ruling that Reandeau was not in custody for *Miranda* purposes during the second interview with Trooper Zito.

*Reandeau's claim that it was plain error to ask the jury to decide whether Reandeau "failed to register" as a sex offender*

■ Reandeau was charged with sexual abuse of a minor and several counts of fourth-degree assault (for his assaults on Florence and Jessica S.). In addition, Reandeau was charged with violating AS 11.56.835(a)—the statute that makes it a felony for a person to violate their duties as a sex offender (the duties prescribed in AS 11.56.840) for a second or subsequent time.

AS 11.56.840 defines the duties of sex offenders to register and to keep the Department of Public Safety apprised of their address.

Subsection (a)(3)(A) of AS 11.56.840 makes it a crime for a sex offender to fail to register. (Registration is a one-time duty.)

Subsection (a)(3)(B) makes it a crime for a sex offender to fail to file a written notice of any change of residence address, mailing address, or electronic address.

Subsection (a)(3)(C) makes it a crime for a sex offender to fail to file the required periodic verification that their address has *not* changed since the time they registered, or since their last change-of-address notification. This verification must be filed annually or quarterly, depending on the severity of the offender's underlying sexual offense. *See* AS 12.63.010(d).

The State's theory was that Reandeau violated subsection (a)(3)(C) of this statute by failing to file the quarterly verification of his address that was due in December 2007. However, the charging document and the jury instructions at Reandeau's trial repeatedly referred to Reandeau's crime as a failure to "register" as a sex offender.

The language of the charging document and the jury instructions tracks the title of the statute: "failure to register as a sex offender". However, this statutory title is mistaken, or at least misleading.

Technically, "registration" is a one-time duty that Reandeau was required to perform when he completed his prison sentence for attempted first-degree sexual assault. *See* AS 12.63.010(a)-(b). The State never presented any evidence (or otherwise suggested) that Reandeau failed to register as a sex offender. Rather, the State's case was premised on the assertion that Reandeau failed to file the December 2007 quarterly verification of his address required under AS 12.63.010(d)(2).

At grand jury, the State presented the testimony of Trooper Zito to support this charge. Zito's testimony shows that he used the terms "registration" and "verification" interchangeably.

Zito told the grand jurors that Reandeau was under a general obligation "to register quarterly"—and that, in particular, Reandeau "was supposed to register by December 31st of 2007". Zito then testified that, according to the official records, the State of Alaska "did not receive the quarterly verification from Mr. Reandeau as of December 2007", and thus Reandeau was not in compliance with his obligations as a sex offender. Zito added that Reandeau himself "admitted to me that he had failed to register" as of December 2007—but, in response to a grand juror's question, Zito acknowledged that Reandeau had later submitted the proper verification, and that he was back in compliance with the law at the time of the grand jury hearing.

During Reandeau's trial, both in discussions outside the presence of the jury and while making his presentation to the jury, the prosecutor repeatedly referred to Reandeau's failure to "register" when the prosecutor clearly was speaking of Reandeau's failure to file the quarterly verification. For example, during the prosecutor's opening statement to the jury, he referred to Reandeau's offense as "[being] out of compliance with the requirement that he quarterly register as a sex offender". The prosecutor told the jurors:

> *Prosecutor:* [I will present the testimony of] Alice Poncho[, who] is with the sex offender registry of the State of Alaska, and works for the Department of Public

Safety. And she'll be testifying before you regarding the defendant's record for registration, and the fact that he was required to register during the month of December of 2007. He had to register between ... December 1st and December 31st, and he did not file the registration during that period of time[.]

Indeed, when Alice Poncho took the stand, she too used the word "register" when she was speaking of the required quarterly verification of a sex offender's address:

> *Prosecutor:* How often is [Reandeau] required to register, ma'am?
>
> *Poncho:* He's required to register quarterly for life.
>
> ...
>
> *Prosecutor:* [So,] was [Reandeau] required to register during the month of December 2007 as part of his quarterly registration ... ?
>
> *Poncho:* Yes.
>
> ...
>
> *Prosecutor:* And ... is this [a] copy of the letter that was sent to Mr. Reandeau, advising him of his obligation to register prior to the end of the month of December 2007?
>
> *Poncho:* Yes.

At the close of the trial, when the prosecutor delivered his summation to the jury, he again referred to Reandeau's failure to "register" as a sex offender when he clearly meant Reandeau's failure to file the quarterly verification of his address:

> *Prosecutor:* [Mr. Reandeau has a] predicate [sex] offense, which is attempted sexual assault in the first degree, for which he was convicted in 1995. That triggered the lifetime registration requirement. He has to register quarterly. He's notified of this. [And] he ... knowingly fail[ed] to register. In this instance, he was given notice of the requirement to make his quarterly registration in December of 2007, [and] he failed to do so. [When he spoke to Trooper Zito] on the morning of January 1st [2008], he was aware that he was in violation. And all he has to do, to do this, is to sign papers and go down to the police

department and fill out the registration form.

Like the prosecutor, the trial judge and the defense attorney used the term "register" when they spoke of Reandeau's duty to file quarterly verifications of his address.

The jury received two instructions on this "failure to register" charge. The first of these instructions, "B–1", described the charge against Reandeau by quoting the language of the charging documents. That is, Instruction B–1 quoted *all* of the statutory requirements, even though most of these requirements had no relevance to the State's theory of prosecution.

The second jury instruction, "B–2", again described Reandeau's offense as "failure to register" as a sex offender. According to this instruction, the State had to prove that Reandeau was a sex offender, that he was aware of his duty to register, that he knowingly failed to register, and that he had previously been convicted of failing to register.

Reandeau's trial attorney did not object to this instruction, but Reandeau argues on appeal that it was plain error for the trial judge to instruct the jurors on a crime that was technically different from the one the State alleged (although it was encompassed by the same criminal statute).

■ An erroneous jury instruction constitutes "plain error" when, given the way the case was litigated, there is a clear likelihood that the jury's decision rested on an erroneous theory, resulting in a miscarriage of justice. *Khan v. State*, 204 P.3d 1036, 1040–41 (Alaska App.2009), citing *Aviation Associates, Ltd. v. TEMSCO Helicopters, Inc.*, 881 P.2d 1127, 1131 n. 7 (Alaska 1994).

Concededly, the initial "registration" required of sex offenders is distinct from the "verifications" of their address that sex offenders must file on an annual or quarterly basis. But in Reandeau's case, the attorneys, the witnesses, and even the trial judge repeatedly used the phrase "failure to register" when it was clear, from the context, that they were speaking of the allegation that Reandeau failed to file his December 2007 quarterly address verification in a timely manner.

Moreover, the prosecutor never presented any evidence, nor did he otherwise suggest, that Reandeau failed to initially register as a sex offender. Rather, the prosecutor repeatedly stated that the charge against Reandeau was premised on the assertion that Reandeau failed to file the quarterly address verification that was due by the end of December 2007.

In other words, even though the wording of the challenged jury instruction was technically erroneous, there is essentially no possibility that the jurors were misled as to the charge against Reandeau, or misled as to the elements that the State was required to prove in order to justify a guilty verdict. For this reason, the erroneous jury instruction does not constitute plain error.

*Reandeau's claim that his sentencing judge violated* Blakely v. Washington *when the judge found that Reandeau engaged in sexual penetration of L.S.*

Reandeau's most serious offense is second-degree sexual abuse of a minor—sexual contact with a minor who is at least 13 years old but younger than 16 years old. This offense is a class B felony. *See* AS 11.41.436(b).

Normally, the maximum penalty for a class B felony is 10 years' imprisonment. However, the legislature has established a substantially more severe penalty range for second-degree sexual abuse of a minor: the maximum penalty for this offense is 99 years' imprisonment. *See* AS 12.55.125(i)(3).

Because Reandeau had a prior conviction for attempted first-degree sexual assault, he faced a presumptive sentencing range of 15 to 30 years' imprisonment. *See* AS 12.55.125(i)(3)(C).

The sentencing judge, Superior Court Judge *pro tempore* Peter G. Ashman, found that one aggravating factor, AS 12.55.155(c)(7), applied to Reandeau's offense, because Reandeau's prior felony (attempted first-degree sexual assault) was of a more serious class than his present felony.

(Reandeau does not challenge this aggravating factor. First-degree sexual assault is an unclassified felony; *see* AS 11.41.410(b). Thus, an attempt to commit this crime is a class A felony; *see* AS 11.31.100(d)(2). Reandeau's current offense is a class B felony.)

In addition, Judge Ashman concluded, based on his review of the evidence in the present case, that Reandeau had not only engaged in sexual contact with L.S. but had also engaged in sexual penetration with her—a more serious offense.

Based on aggravating factor (c)(7), and additionally based on his conclusion that Reandeau committed a higher degree of offense by penetrating the victim, Judge Ashman sentenced Reandeau to 50 years with 25 years suspended. In other words, Reandeau received 25 years to serve—a sentence toward the top of the presumptive range—with an additional 25 years suspended.

Because Reandeau has a prior conviction for a sexual felony, he is not eligible for good time credit (which normally reduces a felony sentence by one-third) when he serves this sentence of imprisonment. *See* AS 33.20.010(a)(3).

Judge Ashman imposed a consecutive sentence of 2 years' imprisonment for Reandeau's separate felony offense of failing to file his quarterly address verification, and the judge imposed a consecutive 180 days (in total) for Reandeau's two misdemeanor assaults on Florence.

All told, Reandeau's composite sentence is 27½ years to serve—and, as explained above, he is ineligible for good time credit for 25 years of this sentence.[3]

---

**3.** Reandeau argues that, because he is ineligible for good time credit, his sentence for the sexual felony is equivalent to a sentence of 33⅓ years—because he must serve the extra third of the sentence that other offenders would not serve, assuming they maintained good behavior.

Reandeau's underlying premise is correct: his sentence is not strictly comparable to other 25–year sentences. But his math is wrong. Because of Reandeau's ineligibility for good time credit, his 25–year sentence for second-degree sexual assault is arguably equivalent to a sentence of 37½ years' imprisonment. Under normal good time credit rules, a person sentenced to serve 37 ½ years would serve two-thirds of this

Reandeau argues that Judge Ashman violated his Sixth Amendment right to jury trial, as interpreted in *Blakely v. Washington*,[4] when the judge found that Reandeau engaged in sexual penetration (not just sexual contact) with L.S. Reandeau notes that the jury found him not guilty of first-degree sexual abuse of a minor (a crime requiring proof of sexual penetration) and instead found him guilty of second-degree sexual abuse of a minor (a crime requiring proof of sexual contact). Reandeau argues that, under *Blakely*, a sentencing judge is bound by the jury's view of the facts—so that even if the judge believes that the evidence establishes a more serious crime, the judge is constitutionally required to set aside any personal views of the evidence and, instead, accept the jury's interpretation.

This *Blakely* argument is waived: it was not presented until Reandeau filed his reply brief, and arguments raised for the first time in a reply brief are waived.[5]

In his reply brief, Reandeau attempts to circumvent this rule by asserting that he raised this *Blakely* argument in his opening brief. He is mistaken. Reandeau's opening brief contains the argument that Judge Ashman may have been *factually* mistaken when he concluded that Reandeau sexually penetrated L.S., but Reandeau's opening brief does not contain the argument that Judge Ashman was constitutionally barred from reaching this conclusion, regardless of the evidence. In fact, Reandeau's opening brief does not even contain a citation to *Blakely v. Washington*.

sentence—25 years—and then be released on parole.

On the other hand, it is not accurate to say that Reandeau's good-time-restricted sentence of 25 years to serve is completely equivalent to a normal sentence of 37½ years to serve. It is true that a defendant sentenced to a normal term of 37½ years would ordinarily serve 25 years (assuming that they maintained good behavior), but then the defendant would be on parole for another 12 ½ years—with the possibility that their good time credit would be revoked and they would have to serve some or all of the remaining 12½ years of their sentence. Reandeau will have to serve 25 years, but then he will be released without parole supervision, and with no portion of his sentence remaining.

In addition to being unpreserved, Reandeau's argument is wrong. Under *Apprendi v. New Jersey*[6] and *Blakely v. Washington*,[7] a defendant's Sixth Amendment right to jury trial requires that any fact other than a prior conviction which increases the maximum authorized penalty for the defendant's crime must be submitted to a jury and proved beyond a reasonable doubt.[8]

But when a sentencing judge chooses the defendant's sentence from within the range of penalties authorized by the jury's verdict, the judge is authorized to rely on their own view of the evidence.

As we explained in *West v. State*, 223 P.3d 634 (Alaska App.2010), a defendant's right to jury trial under *Apprendi* and *Blakely* hinges on the consequences of resolving the contested issue of fact in the government's favor. If resolution of the issue of fact in the government's favor means that the defendant will face a greater maximum sentence, or a higher presumptive range of imprisonment, then the defendant has a right to jury trial on that issue. 223 P.3d at 638. Conversely, if resolution of the disputed issue of fact in the government's favor will *not* alter the defendant's maximum sentence, then the defendant has no right to jury trial on that issue.

Here, because Reandeau was convicted of second-degree sexual abuse of a minor, and because he had one prior sexual felony, Reandeau was subject to a presumptive sentencing range of 15 to 30 years' imprisonment. AS 12.55.125(i)(3)(C). The superior court found one aggravating factor: that

**4.** 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004).

**5.** *See, e.g., Petersen v. Mutual Life Ins. Co. of New York*, 803 P.2d 406, 411 (Alaska 1990); *Hitt v. J.B. Coghill, Inc.*, 641 P.2d 211, 213 n. 4 (Alaska 1982).

**6.** 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000).

**7.** 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004).

**8.** *Blakely*, 542 U.S. at 301, 124 S.Ct. at 2536 (quoting *Apprendi*, 530 U.S. at 490, 120 S.Ct. at 2362–63); *Forster v. State*, 236 P.3d 1157, 1169 (Alaska App.2010).

Reandeau's prior felony (attempted first-degree sexual assault) was of a more serious class than his current offense. *See* AS 12.55.155(c)(7). Reandeau does not challenge that aggravator.

Because the State proved this aggravating factor, the superior court was authorized to sentence Reandeau to any term of imprisonment up to the statutory maximum of 99 years. *See* AS 12.55.155(a)(2) and AS 12.55.125(i)(3).

Thus, when Judge Ashman decided what sentence to impose within this authorized range, he was entitled to rely on the fact that, in his view, the evidence established that Reandeau actually committed a higher degree of offense by engaging in sexual penetration with L.S.

As we held in *Cleveland v. State*, 143 P.3d 977 (Alaska App.2006), a defendant's right to jury trial under *Blakely* is satisfied (under Alaska's presumptive sentencing laws) "if there is at least one *Blakely*-compliant aggravating factor—*i.e.*, at least one aggravating factor that flows directly from the jury's verdict, or is admitted by the defendant, or is based on the defendant's prior convictions." 143 P.3d at 984–85. Thus, when at least one *Blakely*-compliant aggravator is present, the sentencing judge does not violate a defendant's right to jury trial when the judge resolves other disputed issues of fact—even when these disputed issues of fact constitute other statutory aggravators. This is true because "[p]roof of additional aggravating factors [does] not alter the range of sentences available to the judge—although these additional aggravators [may] obviously be important to the judge's choice of sentence within that sentencing range." *Id.* at 984.

*Reandeau's claim that his failure to file a timely verification of his address in December 2007 was among the least serious within the statutory definition of the offense*

■ With respect to Reandeau's conviction for failing to file a timely verification of his address for the quarter ending December 2007, Reandeau proposed one mitigating factor: AS 12.55.155(d)(9)—that his conduct was among the least serious within the statutory definition of the offense. Judge Ashman rejected this proposed mitigator, and Reandeau now argues that this ruling was erroneous.

In support of this proposed mitigator, Reandeau offered evidence that there were other previous instances where he was tardy in filing his quarterly address verifications, and the State did not prosecute him for those lapses. Reandeau argues that the State's past laxity led him to believe that the authorities did not consider it particularly important for sex offenders to file their quarterly verifications on time.

Reandeau further suggests that there is a good reason why this statutory requirement is not vigorously enforced: he contends that a sex offender's failure to file a quarterly verification that their address has *not* changed is simply not as important, or as harmful to society's interests, as a sex offender's failure to notify the authorities when their address *has* changed—conduct that is covered by a separate subsection of the statute.

When Judge Ashman rejected Reandeau's proposed mitigator, he gave this explanation for his ruling:

> *The Court:* As to the mitigator, ... I don't believe this is among the least serious conduct. I think "least serious conduct" might be something like some misunderstanding about the [filing] dates, some error in mailing, some effort to comply but failure to complete the compliance for circumstances that are essentially excusable. [This] defendant has two priors for failure to register, [and] a long history of registering late. Under those circumstances, I don't believe the Court can find by clear and convincing evidence [that Reandeau's conduct in this case] is [among] the least serious. In fact, it meets the precise definition of the crime.

In his brief to this Court, Reandeau does not dispute any of Judge Ashman's statements concerning Reandeau's history of tardy compliance with the statutory requirement, or the fact that Reandeau had been previously prosecuted for tardy compliance.

(Arguably, it was improper for Judge Ashman to consider one of these two prior prosecutions for this purpose. Reandeau was

convicted of *first-degree* failure to register, rather than second-degree, precisely because he had previously been convicted of this offense. But Judge Ashman could properly consider the fact that Reandeau was a third-time offender.)

As Judge Ashman noted, the facts of Reandeau's current offense are within the main definition of the offense. And even if Reandeau's current offense were arguably mitigated, Judge Ashman could properly consider Reandeau's history of similar violations—both prosecuted and unprosecuted—when deciding whether Reandeau had proved his proposed mitigator.

The fact that the government had turned a blind eye to several of Reandeau's past violations of the reporting requirement might support the conclusion that the government viewed Reandeau's *past* violations as *de minimis,* but the government's failure to prosecute Reandeau for these past transgressions says little about whether Reandeau's *current* violation of the reporting requirement is among the least serious.

In sum, the facts of Reandeau's case support Judge Ashman's rejection of the proposed mitigator.

*The superior court's written judgement should be amended*

■ In addition to finding Reandeau guilty of second-degree sexual abuse of a minor, the jury also found Reandeau guilty of third-degree sexual assault, under the theory that he engaged in sexual contact with a person who was incapacitated or unaware of the sexual conduct.

Judge Ashman did not enter a separate conviction and sentence for this crime. Rather, the judge merged the two crimes and sentenced Reandeau as if he had been convicted solely of second-degree sexual abuse of a minor. However, the written judgement notes the jury's verdict on the third-degree sexual assault—and it describes that charge incorrectly.

As Reandeau notes in footnote 15 of his opening brief, the superior court's written judgement erroneously describes Reandeau's crime of third-degree sexual assault as a violation of AS 11.41.425(a)(1)(A), which prohibits sexual contact with a mentally incapable person. Reandeau's offense was actually a violation of AS 11.41.425(a)(1)(B) or (C)—sexual contact with a person who is incapacitated or who is unaware of the sexual conduct.

Reandeau asks that this clerical error be corrected. The State does not respond to Reandeau's argument; indeed, the State may have missed the argument, because it is contained in a footnote. (We ask that, in the future, attorneys refrain from raising arguments in footnotes.) Nevertheless, there appears to be no reason why we should not order the superior court to correct the judgement.

*This Court has no jurisdiction to decide whether Reandeau's composite sentence is excessive*

■ Having resolved Reandeau's attacks on the manner in which the superior court imposed his sentence, we now turn to Reandeau's claim that his composite sentence is excessive. We conclude that Reandeau has no right to raise this claim in his appeal, and that this Court has no jurisdiction to resolve this claim.

As we have already explained, Reandeau faced a presumptive sentencing range of 15 to 30 years' imprisonment for his most serious offense, second-degree sexual abuse of a minor. Reandeau's composite sentence (his total sentence for all four of his offenses) is 27½ years to serve. In other words, Reandeau's composite term to serve lies within the presumptive range for his most serious offense.

AS 12.55.120(a) declares that a felony defendant can ordinarily appeal "[any] sentence of imprisonment lawfully imposed by the superior court for a term or for aggregate terms exceeding two years of unsuspended incarceration". But AS 12.55.120(e) limits this right of appeal. Subsection (e) states that "[a] sentence within an applicable presumptive range set out in AS 12.55.125 ... may not be appealed to the court of appeals under [AS 12.55.120] or AS 22.07.020 on the ground that the sentence is excessive."

Rather, the defendant only has the right to petition the Alaska Supreme Court for discretionary review of the sentence. *Ibid.*

Here, AS 12.55.120(e) appears to bar Reandeau from appealing his sentence—because Reandeau's composite term of active imprisonment (*i.e.,* his time to serve) falls within the 15– to 30–year presumptive range that he would have faced had he been convicted solely of his most serious offense, second-degree sexual abuse of a minor.[9] This jurisdictional issue was not raised in the parties' opening round of briefs. However, this Court is obliged to take cognizance of a flaw in our subject-matter jurisdiction, even when this problem is not raised by the parties.[10] We accordingly asked the parties to file supplemental briefs on this issue.

Reandeau suggests that the statute does not bar Reandeau from pursuing a sentence appeal because, even though Reandeau's time to serve falls within the applicable 15– to 30–year presumptive range, Reandeau's *total* sentence includes an additional 25 years of suspended imprisonment. Reandeau argues that since his total sentence (52½ years with 25 years suspended) is greater than the 30–year top of the presumptive range, he has the right to pursue this sentence appeal (and this Court has jurisdiction to decide the appeal).

In particular, Reandeau relies on this Court's decision in *Heavyrunner v. State,* 172 P.3d 819 (Alaska App.2007). In *Heavyrunner,* we held that a defendant pursuing a sentence appeal is entitled to challenge not only the time-to-serve component of their sentence, but also the amount of suspended imprisonment they received—and that when this Court decides whether a sentence is excessive, "we must consider the sentence in its entirety, including all suspended time". 172 P.3d at 821.

*Heavyrunner* stands for the proposition that this Court will consider the entirety of a defendant's sentence when we decide the defendant's sentence appeal—*if* the defendant has a right to appeal the sentence. But *Heavyrunner* does not address the question of whether a defendant's suspended jail time is to be taken into account when determining whether the defendant's sentence is severe enough to trigger a right of appeal under AS 12.55.120.

We have never addressed this issue in the context of AS 12.55.120(e). However, in *Cragg v. State,* 957 P.2d 1365, 1368 (Alaska App.1998), we addressed the issue of suspended imprisonment in the context of AS 12.55.120(a). This statute declares that a defendant has no right to pursue a sentence appeal unless their composite time to serve exceeds 2 years for a felony, or 120 days for a misdemeanor. In *Cragg,* we rejected the argument that a substantial term of suspended imprisonment could trigger a right of sentence appeal: we held that a defendant has no right to pursue a sentence appeal if the defendant's time to serve is less than the statutory minimum, even though the defendant's total sentence (including suspended time) is greater than the statutory minimum.

We acknowledge that the wording of AS 12.55.120(e) differs from the wording of AS 12.55.120(a), in that subsection (e) does not contain an explicit reference to the "time to serve" component of the defendant's sentence. Instead, subsection (e) simply states that "a sentence within [the] applicable presumptive range ... may not be appealed to the court of appeals ... on the ground that the sentence is excessive." Nevertheless, based on the legislative history of subsection (e), we conclude that when the legislature used the phrase, "a sentence within [the] applicable presumptive range", they meant "an unsuspended sentence" within the applicable presumptive range.

Subsection (e) of AS 12.55.120, as originally proposed in Senate Bill 56 (24th Legislature),[11] would have eliminated all appellate

---

**9.** See *Peters v. State,* 943 P.2d 418, 421 (Alaska App.1997), where this Court held that when a defendant is sentenced for two or more crimes, the defendant's composite time to serve determines whether the defendant has received the statutory minimum sentence that triggers the right of sentence appeal.

**10.** *Robertson v. Riplett,* 194 P.3d 382, 386 (Alaska 2008).

**11.** The companion bill was House Bill 78.

review of a sentence for excessiveness if the sentence was within the applicable presumptive range set out in AS 12.55.125. Here is the text of the original version of this provision:

(e) A sentence reviewed by the appellate court under this section and AS 22.07.020, or by the superior court under AS 22.10.020, or a sentence reviewed by petition accepted under court rules, may not be reversed as excessive, and the sentencing court is not required to make specific findings, if the sentence is within an applicable presumptive range set out in AS 12.55.125, or is a consecutive or partially consecutive sentence imposed in accordance with the minimum sentences set out in AS 12.55.127.

During committee hearings on this bill, some legislators expressed concern that it would be unconstitutional to eliminate all right of sentence review. This problem was addressed in a legislative research report and a memorandum to the House Judiciary Committee from the Public Defender Agency.

Both the report and the memorandum pointed out that Alaska Appellate Rule 215(a)(5) explicitly grants defendants a right of discretionary sentence review (by petition to the Alaska Supreme Court) in cases where there was no statutory right of sentence appeal.[12] The report and the memorandum also suggested that eliminating all right of sentence review would run afoul of this Court's decision in *Rozkydal v. State*, 938 P.2d 1091 (Alaska App.1997).

(In *Rozkydal*, this Court interpreted subsection (a) of AS 12.55.120, which declares that a felony defendant has no right to appeal their sentence unless the sentence exceeds two years to serve. To avoid constitutional problems, we held that this limitation on the right of sentence appeal did not limit a defendant's right to petition the supreme

court for discretionary review of their sentence. 938 P.2d at 1094–95.)

Senate Bill 56 was amended in response to these concerns, changing the language of AS 12.55.120(e) to its current form:

(e) A sentence within an applicable presumptive range set out in AS 12.55.125 or a consecutive or partially consecutive sentence imposed in accordance with the minimum sentences set out in AS 12.55.127 may not be appealed to the court of appeals under this section or AS 22.07.020 on the ground that the sentence is excessive. However, the sentence may be reviewed by an appellate court on the ground that it is excessive through a petition filed under rules adopted by the supreme court.

(This amended language was adopted by the House Judiciary Committee[13] and was subsequently incorporated into the House Committee Substitute for Senate Bill 56.[14])

This legislative history shows that the legislature intended for the limitation on sentence appeals codified in subsection (e) to work in tandem with the right to petition for sentence review granted by Appellate Rule 215(a)(5). From this, we conclude that AS 12.55.120(e) should be construed to refer to unsuspended sentences of imprisonment. Appellate Rule 215(a)(5) gives defendants the right to ask the supreme court for discretionary review of *unsuspended* terms of imprisonment that are not appealable to this Court. Accordingly, we should construe AS 12.55.120(e) in a like manner—that is, construe it to eliminate the right of sentence appeal for defendants who receive *unsuspended* terms of imprisonment within the applicable presumptive range.

For these reasons, we hold that, under AS 12.55.120(e), a defendant's right to pursue a sentence appeal is determined by the defendant's time to serve.

---

12. Alaska Appellate Rule 215(a)(5)—entitled *"Right to Seek Discretionary Review [of a sentence] for Excessiveness"*—provides that a defendant "may seek discretionary review of an unsuspended sentence of imprisonment which is not appealable ... by filing a petition for review in the supreme court under Appellate Rule 402."

13. Minutes of the House Judiciary Committee, February 4, 2005, regarding C.S.S.B. 56 (*i.e.*, Committee Substitute for Senate Bill 56), at 1:17:20–1:33:28.

14. House Committee Substitute (Judiciary) for C.S.S.B. 56, offered on February 9, 2005.

Because Reandeau's composite time to serve is 27½ years, and because this is less than the 30-year ceiling of the presumptive range that applies to his most serious offense, we conclude that Reandeau has no right to appeal his sentence on the ground of excessiveness, and we further conclude that this Court lacks jurisdiction to adjudicate Reandeau's claim that his sentence is excessive. See AS 22.07.020(b), which declares that this Court has jurisdiction to hear appeals of felony sentences that exceed 2 years to serve "except as limited by AS 12.55.120".

We are mindful of the real-life consequences of our decision, especially for defendants convicted of sexual felonies. The legislature has recently created special presumptive sentencing ranges for sexual felonies—sentencing ranges that are substantially more severe than the presumptive ranges that normally apply to defendants convicted of the same classes of felony offenses. For example, Reandeau's most serious offense is a class B felony. Instead of facing the presumptive range that normally applies to a second felony offender convicted of a class B felony (*i.e.*, 4 to 7 years' imprisonment[15]), Reandeau faced a presumptive range of 15 to 30 years' imprisonment. Because Reandeau's composite time to serve falls within this range, he has no right to pursue a sentence appeal, even though he faces almost three decades of imprisonment—and even though the legislature has declared that defendants in his sit-

uation are not eligible for the normal credit for good behavior.

We express no opinion as to whether there might be good reason to review Reandeau's sentence. We hold only that, regardless of whether Reandeau's sentence might merit review, this Court has no jurisdiction to undertake that review. Accordingly, we refer Reandeau's excessive sentence claim to the Alaska Supreme Court pursuant to Alaska Appellate Rule 215(k).

*Conclusion*

The superior court should amend the wording of Reandeau's judgement so that it lists Reandeau's conviction for third-degree sexual assault as a violation of AS 11.41.425(a)(1)(B)-(C).

Because this Court has no jurisdiction to decide Reandeau's excessive sentence claim, we refer that claim to the Alaska Supreme Court for discretionary review pursuant to Appellate Rule 215(k).

In all other respects, the judgement of the superior court is AFFIRMED.

BOLGER, Judge, not participating.

---

**15.** *See* AS 12.55.125(d)(3).